No. 13.—Joseph Bond, plaintiff in error *vs*. The Central Bank of Georgia, defendant in error.

[1.] There must be a *time* averred in the writ, when every material or traversable fact transpires.

[2.] In a suit by the *bearer* against the *maker* of a note, the omission in the declaration to allege the time when the note was transferred, is cured by verdict or confession of judgment.

[3.] No promise need be alleged in a declaration when the facts set forth show a legal liability without it.

[4.] The 25th section of the original charter of the Central Bank of Georgia, limited loans to any one person to $2,500. In a suit by the Bank upon a renewal note under the amended charter of 1829, or on a bill of exchange discounted or purchased under the act of 1838, for the purpose of remitting funds to pay interest on the State's bonds or foreign debt, it is not necessary to set out these latter acts *as exceptions* to the limitations contained in the original statute, and to aver that the debt sued on was contracted under the powers which they confer. These acts were passed to extend the original charter, by clothing the Bank with additional authority, and the courts are bound to observe their provisions.

[5.] The *bona fide* holder of a negotiable note, payable to bearer, for a valuable consideration, without any notice of the facts which impugn its validity, as between the previous parties, if it is transferred before it becomes due, takes it unaffected by these facts.

[6.] The holder of a negotiable instrument is presumed to be a *bona fide* holder for a valuable consideration, without notice.

[7.] The extinguishment of a pre-existing debt constitutes a valuable consideration for the transfer of a negotiable note. And the holder thus receiving it, before due, and without notice, is unaffected by the equities between the antecedent parties.

[8.] The newspaper itself is the best evidence of the contents of any article which has been published in its columns.

[9.] The regulations in the 11th and 21st sections, and the limitation as to amount in the 25th section of the original charter of the Central Bank of Georgia, are *directory merely*, to the officers of the institution. And a debt may be collected, although contracted in disregard of any or *all* of these provisions; that is, being without

Bond *vs.* The Central Bank of Georgia.

security or indorser, having run more than twelve months, and exceeding the sum of $2,500.

[10.] Under the amended charter of 1829, persons indebted to the State in a sum exceeding $2,500 may renew their notes for the whole amount of the debt. And, under the act of 1838, the Directors of the Central Bank are authorized to discount or purchase bills of exchange or other paper to pay the interest on the public debt, without reference to the limitation contained in the 25th section of the original charter. A debt contracted under either of these acts will be presumed to have been done in good faith, in the absence of any fact or circumstance implicating it.

Action of Assumpsit. From Lee Superior Court. Tried before Judge Warren, November Term, 1846.

For the facts of the case, and the grounds of error, see the decision of the Supreme Court.

HINES and HOLT, for the plaintiff in error.

Mr. Hines for the plaintiff in error submitted the following points, and relied on the authorities cited.

The writ of the plaintiff below was insufficient. Cited Judges Cole and Tracey's decisions; also 1 *Chit. Pl.* 302; 10 *Wend. R.* 487, *et passim;* also *Acts of* 1838, *Pamph. p.* 46.

The receipt of William F. Bond, the payee, and the testimony of James Bond going to prove the contract between the original parties to the note sued on, at the time it was given, were admissible in evidence, and the Court below erred in ruling them out. 1 *Greenleaf Ev.* 125.

The testimony of Henry Morgan and James Bond, proving the publication of Joseph Bond's notice in the South Western Georgian, cautioning all persons against receiving or trading for the note sued on was admissible, and the Court below committed error in ruling it out; and also in its decision upon the question of notice to the defendant in error, a paper containing said caution having been sent by mail to Dr. Fort, then President of the Central Bank, before the transfer of the note by Beall to the Bank. At all events this was proper testimony for the jury. 3 *Burr. R.* 1522.

The charge of the Court below to the jury was erroneous. 12 *Wheat. R.* 180.

To protect the holder against the equities subsisting between the maker and payee of a promissory note transferred before maturity, he must have received the note *bona fide* in the due course of trade,

and for a valuable consideration, otherwise the equities, if any between the original parties, will subsist and may be set up against the holder. 5 *John. Ch. R.* 54; 20 *John. R.* 637; *Bayl. on Bills,* 536; *Story on Prom. Notes,* ; 4 *Binn. R.* 367; 10 *Wend. R.* 85.

A Corporation is the creation of the law, having such powers as are specifically granted by the act creating it, or as are necessary to carry into effect the powers granted, and not having any other. 2 *Kent Comm.* 298; *Bank U. S.* vs. *Deveaux and others,* 6 *Cranch R.* 61; *Trustees of Dartmouth* vs. *Woodward,* 4 *Wheat. R.* 518.

All incidental powers and capacities of corporations may be restrained and limited by the act of incorporation, and when not so limited they can only be exercised to effect the purpose for which they were conferred by the government. *Angell & Ames on Corp.* 64 *to* 69; *ib.* 192, 195; 13 *Peters R.* 587.

A Corporation authorized to invest its money on bond and mortgage, cannot recover money lent, except upon bond or mortgage; any other security as well as the contract itself being void. *Angell & Ames on Corp.* 96; 15 *John. R.* 358; 7 *Wend. R.* 31.

Mr. H. then cited and commented on the powers and limitations of the Central Bank charter, as well as the legislative construction of those powers and limitations. *Prince Dig.* 75; *Acts of* 1838 *Pamph. p.* 46, &c.

DUDLEY & McCAY, for the defendant in error.

Mr. Dudley in the opening argument for defendant in error insisted—

The first objection taken to the recovery in the Court below, was that the charter of the Bank prohibited a loan of more than $2,500 to a single individual—that the sum sued for here greatly exceeded that amount; and that there was no averment in the declaration showing the special authority of the Bank to hold and sue so large a debt against any one individual.

The hard shell doctrines of the dark ages were cited to support this objection and were overruled.

For the plaintiff below it was urged—that the power to loan money to the citizens of the respective counties in this State, was but a very small part of the corporate powers of the Central Bank.

That said Bank had power to discount bills of exchange and notes on two or more good securities or indorsers. *Sec.* 11 *P. D. p.* 73. The right to sue; *sec.* 15, *p.* 74.

To exercise all power and authority necessary for the well governing and ordering the affairs of the corporation and promoting the interest and credit thereof. *Sec. 16, p. 74.*

To loan money as equally as practicable to the citizens of the respective counties, and *when* this power is *exercised* the sum not to exceed $2,500 to the same person. *Sec. 25, p. 75.*

To allow debtors to the State to run notes in the Bank for any amount whatever. *Sec. 1, am. ch. p. 75.*

To act as the fiscal agent of the State in all its monetary operations committed to its charge as fully and completely as the State itself could do. *Sec. 12, p. 77.*

The Legislature itself decided that it is not illegal for *one* individual to draw a larger sum than $2,500 on a bill of exchange. *P. D.* 138.

That the objection rested upon a false assumption, viz: that this was a loan to Bond contrary to the 25th *sec. of ch.*

As the chartered agent for collecting State dues the Bank was not restricted to any specified sum in suits brought for that purpose.

The simple right to sue carries along with it those incidents which would entitle the Bank to recover here; *e. g. to compromise debts.*

To accept something else in satisfaction. *Bank of Augusta* vs. *Earle,* 13 *Pet.* 521; *A. & A.* 208.

Independently of these broad provisions of the charter, the Bank would have the *inherent* right to purchase this note and deal with it as her own. *A. &. A.* 64, 65; 2 *Kent* 278 *o. p.*

To illustrate the more liberal and enlightened doctrines of modern times, the Bank relied on *A. & A.* 188; *sec.* 10 *entire and pp.* 192, 193.

A corporation in receiving a contract for debt shall be presumed to have acted within its powers. 2 *Phil. Ev.* 298, 299; 2 *Cow.* 644; 12 *Wheat.* 69 *and cases cited.*

Maxim.—"*Omnia presumuntur rite et solenniter esse acta donec probetur in contrarium.*"

*Argumenti gratia* we might concede that the officers of the Bank violated the 25th section of charter, and it would avail Bond nothing —

1st. Because it is merely directory.

2d. Because it does not declare the contract void. 2 *Ala. R. N. S.* 462 *to* 465; 6 *Serg. & Rawle,* 166; 12 *Ib.* 306; 12 *Wheat.*

64; 6 *Cond. R. S. C. U. S.* 454; 2 *Conn. R.* 252; 3 *Rand.* 141; 9 *Mass.* 423; 16 *Ib.* 102.

Second. For Bond it was contended in the Court below that inasmuch as the Bank had taken this note in payment of a *precedent debt* it took it subject to *all the equities* existing between the original parties.

To support this proposition *Rosa* vs. *Brotherson,* 10 *Wend.* 85, and other New York cases were relied on. Bond proved by A. M. Nisbet and J. S. Thomas, that the note in suit was taken in payment of precedent debts due the Bank.

They proved also, that the note was taken by the Bank *before maturity,* that it was taken in the usual course of trade, that the note was taken by the Bank officers without any knowledge of any infirmity whatever as between the maker and payee.

That the *precedent debts* were bills of exchange indorsed by two persons having large property in possession and that said bills were surrendered and given up at the time the exchange of debts took place.

Counsel for the Bank relied on the following principles of Commercial Law which the Court decided to be applicable and to control the case. *Story on Prom. Notes,* secs. 186, 190, 191, 192, 194, 195, 196, 197, *and cases cited;* 16 *Pet. R.* 1, *et. seq.; Story on Bills,* sec. 188, 189, 191, 192, 193, 194.

In all cases of notes indorsed where one is fairly received in renewal of another, it discharges the first, and the second is taken in the usual course of trade and for a good consideration passing at the time. *Nichols* vs. *Bate,* 10 *Yerg.* 410; *cited Chit. on B.* 173 *n.*

Third. James Bond, brother of defendant, was called by him to prove that he heard W. F. Bond the payee, say, that this note and others were to be paid off by defendant's taking up W. F. Bond's notes on which defendant was indorser, without being able to say whether this note was in W. F. Bond's possession at the time or not.

This testimony was objected to and ruled out, and we say properly, on the ground that W. F. Bond was himself a competent witness, and his sayings not admissible, and on other grounds suggested by the following authorities. *Chitty on Bills,* 663. *o. p.* and cases there cited; *Hedger* vs. *Horton,* 3 *C. & P.* 179; 14 *E. C. L.* 261; *Barough* vs. *White,* 4 *B. & C.* 325; 10 *E. C. L.* 345; *Spargo* vs. *Brown,* 9 *B. & C.* 935; 17 *E. C. L.* 525; *Beauchamp* vs. *Perry,* 1 *B. & A.* 89; 20 *E. C. L.* 351.

---
Bond *vs*. The Central Bank of Georgia.
---

Mr. McCay, in the concluding argument for defendant in error, contended—

As to the question of the legality of the transaction, the presumption is with the Bank.   2 *Cowen R.* 664.

The construction of the charter, contended for on the other side, is onerous and unreasonable.

Bond cannot dispute our right, he did not contract with us.

Beall's insolvency was no notice, as the note was not lost or stolen.

The notice to Doctor Fort was none to us.   The precedent debt doctrine, is neither law nor reason.   1 *Starkie*, 1, 20;  3 *Burr. R.* 1463 ; and this case is out of the rule.   21 *Wend. R.* 499 ; 24 *ib.* 115.

The date of a paper is *prima facie* the time of its execution. *Cowen's Notes to Phil. Ev.* 1453.

Parol evidence is inadmissible to vary the note.   *Cowen's Notes to Phil. Ev.* 1460; 14 *Mass. R.* 154; 4 *ib.* 414; 1 *Chitty*, 661.

The *super-se-assumpsit* is good.   4 *Mass. R.* 451.

*By the Court*—Lumpkin, J. delivering the opinion.

In the month of February, 1844, Samuel Beall, being indebted to the Central Bank of Georgia on sundry notes, transferred by delivery to that institution in discharge of his liabilities a note for eight thousand six hundred and eighty dollars, given by Joseph Bond to William F. Bond, and payable to the said William F. Bond or bearer, on the first day of March, 1844, and bearing date 23d of February, 1842.

To the May Term, 1844, of the Superior Court of Lee county, an action of assumpsit was brought by the Bank, on said note, against Joseph Bond, the maker.   The declaration is in the following words.   " The petition of the Central Bank of Georgia showeth, that Joseph Bond, of said county, hath damaged plaintiff sixteen thousand dollars.   For that, on the twenty-third day of February, eighteen hundred and forty-two, defendant made his promissory note of that date, and delivered the same to one William F. Bond, which is now to the Court shown, by which, by the first day of March, eighteen hundred and forty-four, defendant promised to pay the said William F. Bond, or bearer, eight thousand six hundred and eighty dollars, for value received.   And, after the making and delivery of the said note, and before pay-

13

ment, for a valuable consideration and in the due course of trade, said William F. Bond transferred said note to plaintiff by delivery, who then and there became, and still is, the lawful bearer thereof, and entitled to payment thereon. By reason whereof the defendant became liable, and in consideration thereof promised to pay plaintiff, the contents of said note, according to its tenor and effect. Yet defendant has not paid said note, but the same to pay has refused, and still refuses to plaintiff's damages as aforesaid," &c.

At May Term, 1845, a judgment was confessed by the defendant for eight thousand two hundred and ten dollars for the principal debt, with interest and costs of suit, reserving the right of appeal; which appeal was duly entered, and the cause set down for final trial in November Term, 1846, before the honourable Lott Warren, Judge of the Southwestern Circuit.

A special jury having been impaneled, and the writ read, the defendant excepted to the sufficiency thereof.

*First.* Because it did not allege any time when the note sued on was delivered to the plaintiff.

*Second.* There was no time stated when the *super-se-assumpsit* was made.

*Third.* The note declared on, exceeding in amount the sum of $2,500, and not, therefore, coming within the provisions of the original Central Bank charter, the plaintiff should have averred in his petition, and proven upon the trial, that the discount or purchase of said note was under the amended charter of 1829 or 1838.

*Fourth.* The note set forth exceeding the sum of $2,500, and no securities or indorsers alleged to be thereon, and being transferred by the payee thereof to the plaintiff, on the day it bears date, and payable two years thereafter, was not such a note as plaintiff, under its charter, or any of its amendments, was authorized to discount, purchase, or receive, in the due course of its business.

All of which demurrers were overruled by the Court. Whereupon the defendant, by his counsel, excepted.

The plaintiff then read the note and submitted the cause. The defendant proceeded to support his plea, which was, that at the time the note was given, the payee agreed with the maker, that he would receive in its discharge any note or execution which Joseph Bond might take up against him, and upon which the said Joseph Bond was liable for him; and that he, William F. Bond, gave his written acknowledgment to that effect. The evidence

was then tendered and rejected by the Court, upon the ground that, if true, it could not affect the present plaintiff. To obviate this objection, the testimony of Alfred M. Nisbet, the Cashier of the Bank, was offered, who proved that Bond's note was taken in the payment of the antecedent indebtedness of Beall to the Bank; and it was contended that, *therefore*, the plaintiff was not a *bona fide* holder for *value* in legal contemplation, so as to exclude the previous equities subsisting between the original parties to the paper. The Court below ruled out the testimony, holding, that the extinguishment of a precedent debt, constituted a sufficient consideration for the transfer of a negotiable security. And to this decision defendant's counsel excepted.

The defendant introduced the Editor of the South-western Georgian, published at Albany, Baker County, Georgia, who swore that an advertisement was inserted in that gazette in the year 1842, by Joseph Bond, cautioning the public against trading for certain notes made by him to William F. Bond, as he was determined not to pay them. The witness further testified, that the paper containing this notice was sent reguarly that year to Doctor Tomlinson Fort, at Milledgeville, the place of his residence, who was at that time the President of the Central Bank. Another witness, James Bond, testified that he had seen and read the publication referred to, and that the note sued on was specified in the notice. The Court, upon application, withdrew this testimony from the jury, deciding that the paper itself must be produced. Whereupon the defendant, by his counsel, excepted.

The defendant tendered in evidence an instrument from W. F. Bond to Joseph Bond, wherein he agreed to receive from Joseph Bond any demands of his, for which the said Joseph was responsible, in satisfaction of his (Joseph Bond's) note, and the declarations of William F. Bond were attempted to be introduced to explain the discrepancy of a month between the dates of the note and the receipt, and to show that the note sued on, was in the possession of him, William F. Bond, when he gave this acknowledgment. The Court rejected this testimony, upon the ground, that the admissions of William F. Bond could not be given in evidence, he himself being a competent witness. Whereupon defendant, by his counsel, excepted.

This case has led to the discussion of many important questions.

The first class of exceptions is to the plaintiff's petition. It [1.]

is certainly true that the writ must aver a time, when every material or traversable fact transpires. It must allege *all* the circumstances necessary for the support of the action, and contain a full, regular, and methodical statement of the injury which the plaintiff has sustained, and the *time* and place, with such precision, certainty and clearness, that the defendant, knowing what he is called upon to answer, may be able to plead a direct and unequivocal defence, and that the jury may be able to give a complete verdict upon the issue, and that the Court, consistently with the rules of law, may give a certain and distinct judgment upon the premises. *Cowp. R.* 682; 6 *East R.* 422; 5 *Tr. R.* 623. In an action, therefore, by the *bearer* of a promissory note, against the maker, the *time* should have been mentioned when the note was delivered. The real day need not be stated. It is usual to aver that it was transferred at its date. But, conceding the omission, is it not cured by the verdict or confession of judgment ?

[2.] After a verdict, courts will presume every thing consistent with law to support it. *Kelden* vs. *Bevins; Cooke R.* 90. Omission to aver "possession," in a declaration for trespass to the personalty, if necessary, is cured by verdict. *Daniel* vs. *Holland,* 4 *J. J. Marshall, R.* 18. The plaintiff, in his declaration on a policy of insurance, alleged that his store was consumed by fire; *held,* that though this was not a technical averment that he was the owner, yet it was sufficient after verdict. *Lane* vs. *Maine M. I. Co.* 3 *Fairf.* 44. So the omission to allege a value in the declaration, would be cured by verdict. *Ib.* A verdict cures *all* defective averments. *Goodloe* vs. *Potts, Cooke R.* 399. The power of a verdict to cure formal defects in pleading, should be liberally applied. *Bank of Utica* vs. *Smedes,* 3 *Cowen R.* 662. This defect being clearly amendable, we hold that the defendant came too late, after joining issue with the plaintiff on the merits, and confessing judgment for the debt.

[3.] And the same rules laid down in the foregoing references apply with equal force to the complaint, that there is no time stated when the *super-se-assumpsit* was made. In declarations upon notes payable to bearer, the usual practice has been, I know, to allege a promise directly to the plaintiff. We do not, however, believe that such allegations are necessary. Where the gist of the action is the promise, as where one upon sufficient consideration undertakes to pay the debt of another, there the declaration will unquestionably be bad, unless the promise is averred. But, here the facts

set forth show a legal liability on the part of the defendant to pay the note.   Has not the plaintiff "plainly, fully, and distinctly set forth his cause of action?" although he has omitted to repeat that the defendant, by reason of his liability, *promised* to pay, &c. Would the defendant or the Court have been aided in the discharge of their respective duties by such an averment? why then encumber the record with allegations which are nothing more than legal deductions from the facts stated?

By the 25th section of the original charter of the Central Bank, [4.] passed December 22d, 1828, it is enacted, that "the directors of said Bank shall distribute their loans as equally as practicable among the citizens of this State, having due regard to the population of the different counties; and no loan made by said Bank to any one person or body corporate, or any society or collection of persons whatsoever, shall exceed $2,500."   *Prince Dig.* 75.

And the 11th section declares that "the said Bank shall discount bills of exchange and notes on two or more good securities or indorsers."   *Prince Dig.* 73.

By the 1st section of the amended charter of 1829, it is provided that "nothing contained in the said act (of 1828) shall be so construed as to prevent or prohibit the directors of the said Bank from allowing any person indebted to the State in a sum exceeding $2,500, from renewing his or her, or their notes, bonds or other specialties, for the whole amount of his, her, or their debt, according to the provisions of the said act."   *Prince Dig.* 75.

And, by the supplemental act of 1838, *Pamphlet*, 46, the directors of the Central Bank are authorized to discount or purchase bills of exchange, or *other paper*, which, in their opinion, may be good, without reference to the limitation contained in the 25th section of the charter of said Bank, only so far as to authorize them to purchase exchange, for the purpose of remitting funds to pay interest on the States' bonds, or any other debt contracted abroad by authority of the Legislature."

Now, it is argued that inasmuch as the note sued on, exceeds the sum of $2,500, and has neither indorser nor security, that it does not fall within the power conferred in the original charter, and that consequently the plaintiff should have averred that the discount or purchase of the note was under the amended charter of 1829 or 1838, and that, for want of such allegation, he cannot recover.

As a rule of pleading, it is a sound position that if a statute or a

private instrument contain in it, first, a general clause, and after-wards a separate and distinct clause, which has the effect of taking out of the general clause something which would otherwise be in-cluded in it, a party relying on the general clause may set out that only, without noticing the separate and distinct clause which oper-ates as an exception; but, if the exception itself be incorporated in the general clause, then the party relying on it must, in pleading, state it, together with the exception. And, if he were to state it as containing an absolute unconditional stipulation, without noticing the exception, it would be a variance. This is the rule laid down by Lord Tenterden, in the case of *Vavasour* vs. *Ormrod,* 6 *Barn. & Cress. R.* 430. But this is not the case *here;* this is no *exception incorporated* in the *general clause,* in the language of the authority, but distinct provisions contained in two amendatory statutes, conferring additional privileges upon the Bank; acts passed for the express purpose of *extending* the *charter* of the insti-tution; and, like all other laws, it is made the duty of the Court to observe them without being pleaded.

[5.] Whether the Court below erred in rejecting the defendant's plea, and the evidence offered to support it, depends upon the set-tlement of the principle upon which that decision rested, namely, that every person is considered the *bona fide* holder, for value, of a negotiable promissory note; not only when he has advanced money or property for it, but also when he received it in payment of a pre-existing debt. It is admitted that the plaintiff took Joseph Bond's note from Samuel Beall, in satisfaction of certain claims held by the Bank against Beall, and it is proven that the transfer was made before the note fell due, and *without notice* of any ob-jection to its payment on the part of the maker. Indeed it is in proof by John S. Thomas, one of the witnesses on the part of the defendant, that Joseph Bond, near one month after the maturity of the note, inquired of him, as the director of the Bank, whether he had not traded for his note; and upon being answered affirmatively, he, Bond, proposed to pay him two thousand dollars soon, and two thousand annually till the debt was discharged, to which witness assented; but Bond failed to comply with the agreement, although he several times afterwards promised to do so. It was likewise in evidence that some of the parties to Beall's paper which was sur-rendered, were entirely responsible. A grave question is here raised for our determination—is the Bank, upon this statement of facts, the *bona fide* holder of Bond's note?

"Every person" says Judge Story, "is treated as a *bona fide* [6.] holder for value, (of a note,) not only when he has advanced money or other value for it, but when he has received it in payment of a *precedent debt.*" *Story on Prom. Notes,* 215. See also *Chitty on Bills ch.* 3, *p.* 85, 8 *ed.* 1833; 3 *Kent Comm.* 81, 4 *ed.;* 4 *Bingh. R.* 496; 8 *Ves.* 531; 12 *Pick.* 399; 16 *Maine R.* 117.

In England this doctrine has been uniformly recognized from *Pillans & Rose* vs. *Van Mierop & Hopkins,* 3 *Burr. R.* 1664, *down to the present time.*

The same rule seems generally to have prevailed in the American Courts.

In the *Bank of Salina* vs. *Babcock and others,* 21 *Wend. R.* [7.] 499, the Supreme Court of New York, held, that when a Bank receives and discounts negotiable paper, places the proceeds to the credit of the holder and charges over against him, and cancels other notes upon which are responsible parties but which are over due and lie under protest, such cancellation is equivalent to *paying value at the time and precludes all defence as existing between the original parties.*

Chief Justice Nelson, who delivered the opinion of the Court in this case, remarks, "there is no question but that the plaintiff received and discounted the note in good faith, and the only pretence of objection to the recovery is, that no value has been given. The answer is, the plaintiff had a right to give up the old securities upon the faith of the new paper. This is parting with value in the strictest sense of the term."

In *the Bank of Sandusky* vs. *Scoville, Barton, and Mooney,* 24 *Wend. R.* 115, the same Court held that where a bank discounts a note to extinguish a debt due it from the holder, or the proceeds are applied towards the discharge of his liability, such acts are equivalent to *paying value at the time,* and constitute the Bank a holder for a valuable consideration. And Mr. Justice Bronson says, "the plaintiff received the note in good faith, and without notice, and the only question is whether they paid a valuable consideration; *I think they did.* The note was discounted by the Bank for the benefit of Ward, the holder, to *extinguish his debt, and the avails went to discharge his liability to the Bank.* It is the same thing, substantially, as though Ward had first received the money and then paid it over to the plaintiff, or indeed to any other creditor. If Ward's liability was discharged, his debt extinguished, it

is impossible to deny that the plaintiff in effect parted with their money, and that Ward received it."

The same doctrine was affirmed so late as 1842, in the case of *Williams, ex'r &c.* vs. *Smith and others,* 2 *Hill N. Y. R.* 301. I am aware that in some of the earlier cases the Supreme Court seem to have departed from this rule. They have returned, however, to the old ground of the text books, and the leading English and American decisions.

In the case of *Thomas F. Townsley* vs. *Joseph K. Sumrall,* this point came under the consideration of the Supreme Court of the United States. And the Court there held that damage to the promissee constitutes as good a consideration as benefit to the promissor; and that it could make no difference in law whether the debt, for which a bill of exchange is taken, is a *pre-existing debt* or money then paid for the bill. 2 *Peter R.* 182.

But, in *Swift* vs. *Tyson,* 16 *Peter R.* 1, this question underwent a most thorough investigation before that high tribunal. The acceptance of the bill of exchange by the defendant having been in New York, it was contended that the injunction of the 34th section of the Judiciary Act of 1789, that "the laws of the several States, except where the Constitution, treaties, or statute, otherwise provide or require, shall be regarded as rules of decision in trials at Common Law in the courts of the United States where they apply," imposed on the Supreme Court an obligation as well to apply the decisions of the courts of that State, as the statutes, to cases which came before the Federal Judiciary.

*Judge Story,* who was the organ of the Court, held that the section referred to was limited in its application to State laws strictly local; that is to say, to the positive statutes of the State, and the construction thereof, adopted by the local tribunals, and to rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable, and intrateritorial in their nature and character. And that it never was supposed that the 34th section did apply, or was designed to apply, to questions of a more general nature, not at all dependent upon local statutes, or local usages of a fixed and permanent operation, as for example to the construction of ordinary contracts or other written instruments, and especially to questions of general commercial law, where the State tribunals are called upon to perform the like functions as the national courts; that is to ascertain, upon general reasoning and legal analogies, what is the true exposition

of the contract or instrument, or what is the just rule furnished by the principles of commercial law to govern the case. And that, while the decisions of the local tribunals are entitled to and would receive the most deliberate attention and respect of that court, still they could not furnish positive rules or conclusive authority by which its own judgments are to be bound up and governed. That the law of negotiable instruments may be truly declared, in the language of Cicero adopted by Lord Mansfield, in *Luke and others* vs. *Lyde*, 2 *Burr. R.* 883, 887, to be in a great measure not the law of a single country only, but of the commercial world. *Non erit alia lex Romæ, alia Athenis, alia nunc, alia posthac, sed et apud omnes gentes, et omni tempore, una eadem que lex obtenebit.*

*Justice Story* reviews the adjudications of the State of New York, which have been mainly, if not exclusively, relied on by counsel for the defendant in the case now at bar, and shows, that it was only for a short period that the Supreme Court maintained, that a pre-existing debt was not a sufficient consideration to shut out the equities of the original parties in favour of the holders. And that no case to that effect ever was so decided by the Court of Errors. And that the more modern cases, even there, have greatly shaken, if they have not entirely overthrown, those decisions, and have brought back the doctrine to that promulgated in *Warren* vs. *Lynch*, 5 *John. R.* 239, and *Bay* vs. *Coddington*, 5 *John. Ch. R.* 54, and the earliest cases.

The Court then proceeds to express their opinion upon the point under discussion, and declare that they have "no hesitation in saying that a pre-existing debt does constitute a valuable consideration, as applicable to negotiable instruments. Assuming it to be true, (which, however, may well admit of some doubt from the generality of the language,) that the holder of a negotiable instrument is unaffected with the equities between the antecedent parties, of which he has no notice, only when he receives it in the usual course of trade and business for a valuable consideration before it becomes due, we are prepared to say, that receiving it in payment of, or as security for, a pre-existing debt, is according to the known usual course of trade and business. And why, upon principle, should not a pre-existing debt be deemed such a valuable consideration? It is for the benefit and convenience of the commercial world to give as wide an extent as practicable to the credit and circulation of negotiable paper; that it may pass not only as security for new purchases and advances made upon the trans-

fer thereof, but also in payment of and as security for pre-existing debts.

"The creditor is thereby enabled to realize or to secure his debt, and thus may safely give a prolonged credit, or forbear from taking any legal steps to enforce his rights. The debtor, also, has the advantage of making his negotiable securities of equivalent value to cash. But, establish the opposite conclusion, that negotiable paper cannot be applied in payment of, or as security for, pre-existing debts, without letting in all the equities between the original and antecedent parties, and the value and circulation of such securities must be essentially diminished, and the debtor driven to the embarrassment of making a sale thereof, often at a ruinous discount, to some third person, and then, by circuity, to apply the proceeds to the payment of his debts. What, indeed, upon such a doctrine, would become of that large class of cases where new notes are given by the same or by other parties, by way of renewal or security to Banks, in lieu of old securities discounted by them, which have arrived at maturity? Probably more than half of all Bank transactions in our country, as well as those of other countries, are of this nature. The doctrine would strike a fatal blow at all discounts of negotiable securities for pre-existing debts." We have not the slightest difficulty, either upon principle or authority, in ruling that the Central Bank, receiving the note of Joseph Bond, payable to William F. Bond or bearer, a month before its maturity, from Samuel Beall, in satisfaction of the pre-existing debts of Beall to the Bank, upon which there were solvent securities, took it free from any equities which might have been set up between the maker and payee. Any other view would destroy the value of negotiable paper; no creditor would ever receive notes from his debtor, if in doing so he incurred the peril proposed by this defence. Instead of waiting with his debtor, by receiving collaterals, and thus strengthening the security of his claim, the gruffy demand in every case would be, "*pay me what thou owest;*" and, in the event of failure, the unfortunate debtor would be hauled instantly to the court-house and the prison. Public policy, no less than humanity, stands opposed to such a conclusion.

And, having settled this question, it necessarily sustains the decision of the Judge of the Circuit, in rejecting the defence set up, and the evidence by which it was sought to be supported. Whether the receipt of William F. Bond to Joseph Bond was executed contemporaneously with the note, and whether the latter was in

possession of the payee at the time he made the acknowledgement as to the mode of its payment, and whether or not these declarations were admissible as a part of the *res gestæ*, notwithstanding William F. Bond was neither a party to the record, nor identified in interest with the plaintiff—I repeat that all these inquiries become wholly immaterial. The Bank being adjudged, in the commercial sense of the term, a *bona fide* holder of the note for value, all this matter is excluded.

Moreover, we are of the opinion, that the Court below [8.] committed no error in withdrawing from the jury the proof as to notice. The paper itself should have been produced, as the best evidence of the contents of the advertisement said to have been published in it. In one of the early cases decided by this Court, *Rogers* vs. *Athinson et al.* 1 *Kelly R.* 12, we took occasion to demonstrate the superiority of *written* over *parol* testimony. And the reason of the rule certainly applies with equal force when the matter in dispute is in print, instead of in *manuscript*. Had the evidence gone to the jury, it fell greatly short of conveying notice to the plaintiff. There was no proof that Dr. Fort, while acting as President of the Bank two years before this note was transferred, ever saw the gazette, or the caution in its columns. At that time the Bank had no interest in the paper. Dr. Fort had gone out of office, and been succeeded by Col. Thomas, long prior to the transfer. The cashier, under all of these administrations, states, upon oath, that Bond's paper was traded *without notice;* no attempt was made to bring home notice to Beall, from whom the Bank received the note, and even if he were an innocent holder, the Bank could be protected in its derivative title under Beall; to defeat the recovery it would be incumbent on the defendant to show, notice to Beall that the note was void in the hands of William F. Bond, from whom he purchased it. *Story on Prom. Notes* 210, *sec.* 191; *Haly* vs. *Lane,* 2 *Atk. R.* 182; *Lickbarrow* vs. *Mason,* 2 *T. R.* 71; *Chalmers* vs. *Lanion,* 1 *Campb. R.* 380; *Robinson* vs. *Reynolds,* 2 *Adol. & Ellis New R.* 211.

One other important question remains to be considered. [9.] The Circuit Judge held, that the plaintiff was entitled to recover, although the note sued on was without securities or endorsers, exceeded the sum of two thousand five hundred dollars, and was payable two years after date. And it has become the duty of this Court upon the present writ of error to decide whether this opinion can be maintained in point of law.

The defendant, in support of his objection, relies on the 25th section of the original charter, which limits loans to two thousand five hundred dollars; on the 11th section, requiring two or more good securities or endorsers on notes and bills of exchange discounted by the Bank; and on section 1st of the amendatory act of 1836, which provides that all notes thereafter discounted at said Bank, shall be renewed annually. *Prince Dig.* 118.

Joseph Bond's note had only one month to run when taken by the Bank; and while it is granted, that it exceeeded the sum of two thousand five hundred dollars, and was without securities or indorsers, still being received in discharge of *sundry* notes due the Bank by Beall, either as principal or indorser, the number and terms of which do not appear from the record before us, the plaintiff might well claim the benefit of the 1st section of the Act of 1829, the provisions of which, as heretofore quoted, equitably, if not literally, apply to the transaction. He might fold his arms and insist, that *non constat*, it does not appear that any of these antecedent debts transcended in amount or varied in their terms, from the regulations in the statute creating this corporation. That while it is admitted that the directions and restrictions in the charter must be obeyed, still it remains for those who charge culpability to show it. That all persons, private and official, natural and artificial, are presumed to do their duty until the contrary is proved. *Omnia præsumuntur rite et solenniter esse acta, donec probetur in contrarium.* That the transcript sent up, which is the only evidence before the Court, contains nothing, as to the original notes of Beall, which would overturn the presumption, that all things were rightly done, *as to them.*

Bond's note, therefore, being taken in liquidation of Beall's, he is estopped from setting up the provisions of the charter for his escape. Suppose that Beall's notes were likely to be lost, and that Bond's note was the only security that could be obtained for their payment, it would be suicidal to hold that the Bank was inhibited from availing itself of this indemnity on account of the limitations in its charter. The power to save its debts is essential to its existence. The regulations in the charter as to discounts, are merely directory. Beall himself, if sued, could not take advantage of any deviation from them; much less can Bond, whose note is taken in discharge of the original debtor. *United States* vs. *Kirkpatrick*, 9 *Wheat. R.* 720; *United States* vs. *Van Zandt*, 11 *Wheat. R.* 184;

Bond *vs.* The Central Bank of Georgia.

*The Bank of the Northern Liberties* vs. *Cresson,* 12 *Sergt. and Rawle R.* 306.

The *President and Directors of the Bank of the Commonwealth of Kentucky* brought a suit for money loaned at the branch at Greensburg. The defendants plead, that the writing sued on was illegal and void, being a renewal note, and a substitution and satisfaction of a former note, the sole consideration of which was, bank paper loaned to the defendant by the plaintiff, by the authority and in pursuance of an act of the Legislature of Kentucky, contrary to the meaning and prohibition of the 1st article and 10th section of the Constitution of the United States, forbidding the emission of bills of credit by any State in the Union. The plaintiffs filed a demurrer to the plea, and Judge Tompkins sustained the demurrer, on the ground that, although the loan may have been illegal, still it was no defence to a suit brought by the Bank on the note for the money. The defendants prayed an appeal. The cause was heard, and the judgment of the court below affirmed. 2 *Littell R.* 300.

*The Bank of Somerset* obtained judgments against one Hughes, on notes executed by him to the Bank. The defendant applied for an injunction against these judgments on four grounds, the first and second of which were, that the Bank had forfeited its charter by commencing its operations as a corporation, before the amount of money required by the act of incorporation was actually received by the commissioners appointed for that purpose, and by since failing to redeem its notes. Judge Owsley delivered the opinion of the Court. " With regard to the first and second ground of equity set up in the bill," said he, " we apprehend they afford no sufficient cause for the interposition of a court of equity. Whether the Bank went regularly into operation, or has since failed to redeem its paper, according to the provisions of its act of incorporation, are inquiries which we suppose cannot be drawn in question in the mode adopted by the complainant. *The justice of the demand against the complainant could in no possible way be affected by such inquiries.*" 5 *Littell R.* 45.

In a suit on a promissory note, at the instance of *Edward Little* vs. *John O'Brien,* 9 *Mass. R.* 403, it was agreed, on a case stated by the parties, that the plaintiff was the agent merely of the Union Fire and Marine Insurance Company, of Newburyport, and that he had no interest or property in the note declared on. For the defendant it was argued that there could be no recovery, because the corporation above named had no authority by law to take such

a note, as it was exceeding their legal powers, and against the positive regulations of the charter under which they claimed to act. The consideration of the note was, then, illegal and corrupt, and the courts would not enforce a contract originating in a direct breach of the law.

*By the Court.*—'The principal objection urged against the plaintiff's recovery in this case arose out of the provisions of the act incorporating the Union Marine and Fire Insurance Company, by which it was required that their capital stock should, within six months after payment, be invested in the funded debt of the United States, or of this Commonwealth, or in the stock of some incorporated banking company. From the facts in the case submitted, it appears that, instead of such investment, the company received of the several stockholders their respective promissory notes, with collateral security for the payment thereof; that they from time to time renewed such notes, either partially or in the whole; and that the note, of which payment is sought in this action, was given for a balance of instalments, due from the defendant as one of the stockholders. And it is insisted that the conduct of the company was such a contravention of their duty as will avoid the note in question.

"*It is a sufficient answer to the objection that it does not lie in the mouth of the defendant, for this cause to avoid his contract, which, as between him and the company, was made on a sufficient consideration.* Whether for this misbehaviour of the corporation the Government might not seize their franchises, upon due process, is a question not now before us."

The *Chester Glass Company* brought an action of assumpsit against *Stephen Dewey*, to recover the original amount or price of a share in the stock of the said company, and also the assessments laid on the said share; and it is alleged in the declaration that the defendant agreed to take the said share, and promised to pay the said original amount, and all the assessments. The plaintiffs also claimed another sum for goods sold and delivered by them to the defendant. The defendant interposed numerous pleas, and among the rest that the company had never been regularly organized, nor even authorised to act as an incorporated company. That they had no right, under their charter, to keep a store and sell goods; and that, therefore, they could not recover against him on his purchases. Parker, Chief Justice, in delivering the opinion of the Court, says: " As to the *fourth* objection, which was to the recov-

ery on the count for goods sold and delivered, on the ground that the plaintiffs were prohibited from trading, it cannot prevail.  The Legislature may enforce the prohibition, by causing the charter to be revoked when they shall determine that it has been abused. The defendant, however, cannot refuse payment on this ground." 16 *Mass. R.* 94.

The *Bank of Virginia*, and *the Farmers' Bank of Virginia*, finding it expedient to erect buildings in the city of Richmond for the transaction of their business, purchased a piece of ground for that purpose, and erected the building.   After this was done there remained a vacant space on each side of the Bank buildings, on which they determined to erect fire-proof brick houses, for the greater security of the banks, and to sell them out to individuals. Before the houses were completed, the banks agreed with *Michael B. Poitiaux*, to sell him one of the tenements for the sum of $15,500, payable at the end of five years, with interest.   The Banks also agreed to advance to the said Poitiaux the necessary sum to prepare the house as an auction store, and to build a small house, to be added to the cost of the tenement, and to be paid for in the same manner.   Bond and security, and a trust deed on the property were to be given.   Poitiaux did accordingly take possession of the said tenement, and received from the banks $5,000 under the agreement, which was laid out by him in the manner contemplated. But he never executed the bond, with security, for $20,500, (the whole sum due,) nor a deed of trust, according to the agreement.

The Banks brought a suit against Poitiaux, to compel a specific performance of this agreement.

Poitiaux plead, among other things, that the Banks had no power to deal in real estate under the circumstances of that in question. Their charters provide that the land which it shall be lawful for them to hold shall be *only* such as shall be requisite for their immediate accommodation, &c. or acquired in satisfaction of debts, &c. and that they shall not, directly or indirectly, deal or trade in any other thing, except bills of exchange, gold or silver bullion, &c.

The Chancellor decreed that the banks had exceeded their powers in purchasing and selling the property in question, it not being necessary for their immediate accommodation in relation to the convenient transaction of their business.   From this decree the plaintiffs appealed, and the Court of Appeals reversed the decree, and held, that notwithstanding the Act of Assembly authorises a Bank to hold as much real property as may be requisite for its im-

mediate accommodation, in relation to the convenient transaction of its business, and *no more*, the Bank may purchase more ground than is necessary for the erection of a Banking-house, build fire-proof houses on the vacant land, for the greater security of the Banking-house, and sell them to third persons. *And that, even if the Bank violated its charter in so doing, the only proceeding against it would be by quo warranto, and the purchasers of the houses cannot resist a specific performance of their contracts by alleging that the Banks had exceeded their powers in erecting and selling the house.*

Judge Green says: "It seems to me that the charters are only *directory* in this respect. They impose no penalty in terms. They do not declare the purchase by, or conveyance to the banks, to be void, nor vest the title in the Commonwealth, or any other than the Banks, in consequence of such purchase and conveyance. The legal title passed to the Banks by the conveyance to them, and their conveyance would effectually transfer that title to any other. If, in making the purchase of the land in question, the Banks violated their charters, the corporation might for that cause be dissolved by a proceeding at the suit of the Commonwealth; and even in that case it seems to be the better opinion that the property, if not previously conveyed to some other, would revert, upon the dissolution of the corporation, to the grantor. The maxim, *factum valet quod fieri non debet*, seems to apply. It would be extremely inconvenient if every contractor with one of these Banks could, for the purpose of avoiding his contract, institute the inquiry whether the Bank had violated its charter. They have a right to insist that the question should be tried by a jury, in a proceeding having that single object in view." 3 *Rand. R.* 136.

In *Fleckner against the Bank of the United States*, the Supreme Court held that the statute incorporating the Bank of the United States does not avoid securities on which usurious interest may have been taken, and that the usury cannot be set up as a defence to a note on which it is taken. *It is merely a violation of the charter, for which a remedy may be applied by the Government.*

Judge Story, who delivered the opinion of the Court, says: "Even if the Bank had violated its charter by this particular transaction, it is not easy to perceive how that objection could be available in favour of Fleckner. The act has not pronounced that such a violation makes the transaction or contract *ipso facto* void, but has punished it by a specific penalty of treble the value. It would, therefore, remain to be shown how, if the Bank had a general right

to discount notes, a contract not made void by the act itself, could on this account, be avoided by the party to the contract." 8 *Wheat. R.* 338.

Fearing that this opinion may be extended to an unreasonable, at any rate an *unreadable* length, I will content myself with one more reference. It is the case of *Bates & Hines* vs. *The Bank of the State of Alabama*, 2 *Ala. R. Judges*, 451.

By the 40th section of the charter of the Bank of the State of Alabama, it is enacted: "It shall not be lawful for the president and directors of said Bank to purchase or discount any draft or bill of exchange for a larger sum than five thousand dollars. And on any draft or bill of exchange purchased or discounted by the said Bank, there shall be at least two responsible indorsers, each of which shall be considered good for the amount of such draft or bill." The ordinary loans of the Bank were limited to two thousand dollars, and, by the 20th section of the charter, the Bank was forbidden from dealing in goods, wares, or merchandise. One John M. Bates, of the County of Greene, being possessed of one thousand and twenty-two bales of cotton in Mobile, Major Cook, acting as the agent of the Bank, advanced to Bates on the cotton *seventy-nine thousand six hundred and thirty-two dollars and seventy-five cents.* The cotton was delivered to Pitcher & Ball, the agents appointed by the Bank to receive it, and Cook executed a receipt setting forth the above facts, and thereupon the defendant made and delivered to Cook the bill of exchange sued upon, and also fifteen other bills of exchange, each for the sum of five thousand dollars, all bearing date, becoming due, and payable at the same time, and indorsed by one Ellis, now deceased, and Hines.

To the action against Bates & Hines on one of these drafts, it was urged in behalf of the defendants, that the Bank, although the property of the State, was a mere corporation, and as such possesses those powers only which are conferred by the charter, or necessary to its existence. That this transaction was illegal, there being no express authority in the charter sanctioning it; and that if the charter prescribes a mode of contracting, and that mode is not observed, or if a contract be made which the charter does not authorize, in either case the contract will be void, and no action can be maintained on it.

For the plaintiff it was insisted that the money was lent on the bills, and that the cotton was taken as collateral security; that it was in the nature of a pledge. But if, within the prohibition of the

charter, though it might authorize a forfeiture of the charter, it could not be taken advantage of by the defendants.

The Court, in their opinion, admit distinctly, that the directions contained in the 40th section of the charter cannot be evaded by *splitting* up a large loan of money into fragments, and taking several bills from the same parties for the whole amount. That it cannot be disguised, that the loan of money, though apparently divided into small sums, is a single transaction, and in effect a loan to the same individuals of the enormous sum of near eighty thousand dollars; thus producing the very result which it was the design of this clause to guard against. Still the Court were unanimous in opinion, that this clause of the charter is *directory merely;* and that, if it be disregarded, no one, a party to its violation, can take advantage of it.

Ormond, Justice, observes: " The management of a private stock Bank might be safely left to the jealous scrutiny of the stockholders; but an institution like ours in which the directors have no private interest, is required to be guarded and secured by checks on the conduct of the agents of the public, to whom the management of the Bank might be intrusted. Accordingly, we find, among other restraints, that the directors were ordered not to lend on note more than two thousand dollars to one individual, or to advance more than five thousand dollars in the purchase of a bill of exchange. The reason of this restraint is most apparent, its intention cannot be misunderstood; it was to secure the Bank against loss, by the loan of large sums to one person. To accomplish this object not only the amount is limited, but the directors are required to take at least two responsible indorsers, either of whom shall be considered good for the whole amount. We presume no one would say the latter part of the clause was not directory, and yet it stands precisely on the same footing with the previous part. It was doubtless expected by the Legislature that its commands should be obeyed by its agents, but it is impossible to suppose that it was contemplated, as the result of a regulation intended to protect the public against loss, that if, by collusion with the directors, or, as was doubtless the fact in this case, by an honest mistake on the part of the directors, an individual could succeed in getting on a bill of exchange a larger sum than the charter allowed, that the same regulation would protect him against paying it. Whatever may be the liability of the directors in such a case, nothing can be clearer to our minds than that the borrower must refund the money.

Bond *vs.* The Central Bank of Georgia.

Any other construction would place the entire capital of the Bank at the mercy of a venal directory and profligate borrowers."

If these adjudications and numberless others which might be adduced to the same effect, be sound expositions of the law, there cannot remain the shadow of a doubt as to the right of the plaintiffs to recover on the case before us. Had they to rely entirely on the original charter of 1828, the case would even then be free from difficulty. The limitations contained in the 11th, 21st, and 25th sections, as to renewals, indorsers, and amount of loans, would clearly be construed directory only. And, notwithstanding any or all of them were disregarded, the debtor would not, on that account, be absolved from his liability. Any other doctrine would be alike revolting to common sense and common honesty. But the amendatory acts of 1829 and 1838, are unequivocal in their character. [10.] And by the latter the directors of the Bank have power and authority to discount, or purchase bills of exchange or other paper, which, in their opinion, may be good, *unlimited* in amount, and with no other restriction on the grant than the end in view, and that is for the purpose of remitting funds to pay interest on the State's bonds, or any other debt contracted abroad by the authority of the Legislature. And this they are authorised to do, "*without reference to the limitation contained in the 25th section of the charter of said Bank.*" Here is an express legislative declaration, with which this Court dare not interfere. What plainer language could have been employed to evince the legislative intention that there should be no restraint in the case specified in this statute. And the proof before the Court below showed, that the indebtedness of Beall to the Bank originated in this way. We are bound to conclude, therefore, that the Bank in the present instance has not exceeded the limits prescribed in its charter. And, were it otherwise, it would afford no justifiable excuse to the defendant for refusing to pay his note. And public policy, as well as the law, fully sanctions, in the judgment of the Court, the doctrines we have endeavoured to establish.

In every way of considering this case, it appears to the Court that there was no error in the Court below, and that the judgment ought to be *affirmed.*