# THE ROCK SPRINGS NATIONAL BANK
## v. LUMAN.

Chattel Mortgage — Sale and Application of Proceeds by Mortgagor — Trust Funds — Banks and Banking — Notice — Appeal and Error — Evidence.

1. The statutory provisions authorizing the insertion in a chattel mortgage of permission to the mortgagor to retain possession and sell portions of the mortgaged property and apply the proceeds to the debt secured by the mortgage, and such a permission inserted in the mortgage, is constructive notice, the mortgage being properly filed, of the fact not only that the property therein described is covered by the mortgage, but, as well, of the provision for such sale by the mortgagor and the application of the proceeds, and that such proceeds in the hands of the mortgagor are held in trust; and any one who obtains such proceeds with notice or knowledge that they are proceeds of certain property, which property was in fact covered by the mortgage, is liable to respond to the mortgagee therefor.

2. The party obtaining the proceeds having constructive notice of the mortgage and its provisions, and actual notice or knowledge of the source from which the money was derived, the liability follows.

3. Knowledge of facts, from whatever source obtained, which are sufficient to put an ordinarily prudent man on inquiry, will charge a purchaser with actual notice of all the facts which such an inquiry would have developed.

4. The cashier of a bank, being a mortgagor of personal property, sold some of the property, taking a draft upon a Chicago bank in payment, and remitted the draft, properly indorsed, to defendant bank with directions to place it to his credit; the bank used the remittance in discharging certain pre-existing debts of the cashier and mortgagor to the bank. In a suit for the money brought by the mortgagee against the bank, Held, that the evidence disclosed knowledge on the part of the bank of the fiduciary character of the proceeds; and that the bank did not stand in the attitude of a purchaser of negotiable paper. The draft should be considered as currency.

5. The bank had the right even with knowledge of the trust character of the fund to place the amount to the credit of the depositor, and to pay the latter's checks upon it not payable to itself or passing to it with its knowledge, but it had no right to participate in the wrongful diversion of the fund by paying itself out of the proceeds of the draft.

6. A banker is not required to protect the rights of third parties, or to initiate any inquiry between them and the customer, but if a depositor seeks to pay his own debt to the banker by an appropriation of funds to his credit, where the banker knows the fiduciary character of the funds, the banker becomes liable as a participant in the unlawful diversion, and liable to the *cestui que* trust. In such case the bank is not in a position to rely upon a presumption that the moneys drawn will be used in discharging the trust.

7. Although the relation between a bank and its depositor is generally that of debtor and creditor, and the balance in the account is only a debt, yet the question is always open while the fund remains, to whom, in equity, does it beneficially belong. If the money belonged to a third person, and was held by the depositor in a fiduciary capacity, its character is not changed by being placed to the credit of the trustee in his bank account.

8.   A judgment against a bank will not be reversed for the erroneous admission in evidence of declarations of its cashier, where such declarations concern matters not material to the issue, or the same facts are brought out by other testimony not objected to, some of which testimony came from witnesses on behalf of the bank.   In such case the bank is not prejudiced by the admission of such declarations.

9.   Payment of compensation to a cashier of a bank while absent attending to business of his own would not make him the bank's agent as to his private concerns.

10.   The fact that an official of a corporation, while temporarily absent attending to matters purely personal, receives his usual salary, does not render the corporation responsible for the acts or conduct of the official during such period, or on any other occasion while not acting within the scope of his employment.

11.   The general rule is that if a trial court arrives at the correct result, no matter how incorrectly it reasoned, the errors occurring at the trial, if not prejudicial, are cured by a proper final decision.   The error complained of must be wrong and prejudicial, and must probably have operated to bring about a wrong final result.

12.   Where the evidence supports the judgment, it is not ground for reversal that it is asserted however truthfully outside of the record, that the trial court, trying the case without a jury, was largely or entirely influenced by some matters which are not material or do not in themselves determine the relative rights and liabilities of the parties.

13.   An appellate tribunal will not reverse upon a mere question of fact unless it appears that the trial court decided against the weight of evidence or contrary to the evidence.   A mere conflict is not sufficient cause for reversal, but the court must have decided against the weight of the evidence, or upon insufficient evidence.

14.   The presumption is that the proceedings of a trial court are correct until affirmative error has been shown, and error can not be predicated upon rulings made during the trial, unless they were erroneous and prejudicial and contributed to a wrong result.

Conaway, J., dissenting.

[On rehearing — For former opinion, see 5 Wyo., 159.   Decided December 6, 1895.   Second rehearing denied February 1, 1896.]

ERROR to District Court of Sweetwater County, HON. JESSE KNIGHT, Judge.

The facts are sufficiently stated in the case as heretofore reported (5 Wyo., 159), and in the opinions which follow. After the previous decision (Dec. 28, 1894), a rehearing was granted. The case was again argued and submitted.

*E. E. Enterline, R. W. Breckons, and A. C. Campbell,* for plaintiff in error.

Statements of an agent are inadmissible to affect the principal, unless they are made in respect to a transaction in which the agent is authorized to appear for the principal, and the agent has no authority to bind his principal by statements made by him as to bygone transactions. (Merch. N. Bk. v. Clark, 34 N. E., 910; 1 Mor. Priv. Corp., 540 a.) A pre-existing debt is a valid consideration for the transfer of negotiable paper. (Reed v. Brown, 56 N. W., 661; Swift v. Tyson, 16 Pet., 1.) Pfeiffer, in remitting the draft to the bank, acted for himself, and his knowledge did not constitute knowledge of, or notice to, the bank, and it was error to admit evidence as to his declarations made after he had resumed his duties at the bank. (Hummel v. Bank, 37 N. W., 954; Corcoran v. Snow Cattle Co., 23 N. E., 727; Mayor v. Bank, 18 N. E., 618; Tunerarity v. Bank, 1 N. E., 281; Manhattan Brass Co. v. Webster G. & R. Co., 37 Mo. App., 145; State Sav. Asso. v. Nixon, etc., 25 id., 642; Hyde v. Larkin, 35 Mo., 365; Allen v. South Boston Co., 22 N. E., 917; Koehler v. Doge, 47 N. W., 913; Com'l. Bank v. Burgoyne, 110 N. C., 267; Mathis v. Pridham, 20 S. W., 1015; Bank v. Lovitt, 21 S. W., 825; Bank v. Babbidge, 36 N. E., 462; Bank v. Clark, 34 id., 908; In re Bank, 58 N. W., 784; Willard v. Denise, 26 Atl., 29; Mechem on Agency, 729; Morse on Banks, 125; Bank v. Newell, 71 Wis., 314; Bank v. Davis, 2 Hill, 451; Cragie v. Hadley, 99 N. Y., 131; Bank v. Neass, 5 Denio, 329; Barnes v. Gaslight Co., 27 N. J. Eq., 33; Finley v. Cowles, 61 N. W., 998; Bank v. Thompson, 57 Fed.,

20; Frenkel v. Hudson, 82 Ala., 158; Wicksham v. C. Z. Co., 18 Kan., 481; Reid v. Bank, 70 Ala., 199.) Where a person seeks to establish a trust fund, the identical proceeds must be traced, and the identical property identified (Bank v. Dowd, 2 L. R. A., 480; Burnett v. Gustafson, 54 Ia., 86). The lien of a chattel mortgage does not follow the proceeds into the hands of a third party. (Waters v. Cass Co. Bank, 65 Ia., 234; Smith v. Crawford Co. etc. Bank (Ia.), 61 N. W. 378.) Where a depositor is indebted to a bank, and sends either a draft, check, or money for deposit, the bank has a right to apply the same on his overdraft or on past due paper. (Bank v. Meyer (Ark.), 20 S. W., 406; Bank v. Kendrick, 21 S. W., 1070; Boettcher v. Bank, 24 Pac., 582; Bank v. Brew. Co., 33 N. E. 1054; Bank v. Gregg, 37 Ill. App., 42; Hayden v. Bank, 29 Ill. App., 458.) The case was tried on a false theory, and the plaintiff in error was prejudiced thereby. The admission of improper testimony, over objection, is reversible error, unless it appears beyond doubt that the rights of the complaining party have not been prejudiced thereby. (Mexia v. Oliver, 13 S. C., 454; 148 U. S., 664; Yankton Co. v. Rosstenstcher, 1 Dak., 125; State v. Nolan, 48 Kan., 723.) Same principle applies to erroneous rejection of testimony. (Craven v. Bennett, 30 Pac., 61.) One who claims error to be non-prejudicial must affirmatively show it to be so. (Mc Cormick H. M. Co. v. Jacobson, 35 N. W., 627; Wendt v. Ry. Co., 4 S. D., 476; State v. Bank, 2 S. D., 538; Swanson v. Frence (Ia.), 61 N. W., 407.) The admission of improper testimony which tends to sustain plaintiff's theory must be held prejudicial. (Bolds v. Woods, 9 Ind. App., 657; Root v. Borst, 142 N. Y., 62; Peck v. Pierce, 63 Conn., 310; Smith v. Satterlee, 130 N. Y., 677.)

*C. C. Hamlin*, for defendant in error.

As cashier of plaintiff in error, Pfeiffer was its general business agent in conducting its pecuniary operations and

managing its concerns. (Wade on notice 683 b.; Bank v. Bank, 77 U. S., 1020; Bank v. State, 10 Ala., 915; 36 Am. Dec., 189, and cases cited in note.) The declarations of the cashier were admissible (Stephen on Ev. Art., 17; Morawetz on Corp., 509, 616; 540 a.; Lane v. Ry. Co. 112 Mass., 455; Morse v. Ry. Co., 72 id., 450; Greenleaf on Ev., 113; Morse v. R. R. Co. 6 Gray, 450; 116 Mass., 171). A chattel mortgage vests the legal title in the mortgagee especially after default. (Cone v. Ivinson, 4 Wyo., 203.) The legal title to the proceeds of the sale of the sheep was in Luman, the mortgagee. Pfeiffer held them in a fiduciary capacity (Pomeroy's Eq. Jur., 1047); and the bank merely stands in the place of the original trustee. (Perry on Trusts, 211–828–842; Pomeroy, 1048, 1044.)

A principal can not take the benefits and reject the burdens of the acts of an agent. (Mechem's Agency, 148 and 730; Story's Agency, 445; Morse on Banks, 110; Fishkill v. Bank, 19 Hun, 345; Atl. Mills v. I. O. Mills, 147 Mass., 274; Holden v. Bank, 72 N. Y., 286; Bank v. Ry. Co., 30 Conn., 270; Pomeroy 909.) The knowledge of an agent within the scope of his authority is the knowledge of the principal. (Mechem's Agency, 718; Wade on Notice, 672; The Distilled Spirits, 11 Wall, 346; Kuhn v. Ins. Co., 34 Pac., 1069; Le Neve v. Le Neve, 3 Atk., 646; Morse, 109; Cragie v. Hadley, 99 N. Y., 131.) The knowledge of an officer of a bank is the knowledge of the bank. (66 Mass., 375; 76 id., 547; 2 Hill, 461; 96 U. S., 647; 32 Fed., 762; 36 Conn., 93.)

Not only was the bank bound by the knowledge of Pfeiffer, but it had notice of the rights of Luman through Goble its vice-president. See Wade on Notice, 11. If the ultimate result was reached, then notwithstanding there may have been some error committed in receiving evidence the same is cured. (Kleiman v. Geiselmann, 45 Mo. App., 497; Whitworth v. Ballard, 56 Ind., 279; 20 Pac., 310.) Error in the admission of evidence is not,

in itself, ground for reversal. No case should be reversed, if after excluding that erroneously admitted there is sufficient to sustain the findings, especially where the case is tried by the court without a jury. (Hooker v. Village, etc., 43 N. W., 741; Price v. Brown, 20 N. E., 381; Silvan v. Hansen, 20 Pac., 136; Fisk v. Reigelman, 43 N. W., 1117; Tex. L. & C. Co. v. Blalock, 13 S. W., 12; Wood and Parlin, 46 N. W., 529; Min. Co. v. Taylor, 100 U. S., 37; Austin v. Ingalls, 20 Pac., 637; Andrews v. Hayden's Admr's, 11 S. W., 428.) Nor will error in the exclusion of evidence, in itself, be ground for reversal where the evidence, had it been admitted, could not have affected the result. (Lewis v. Simon 10 S. W., 554; Bank v. Spinney, 47 Hun, 293.) The pre-existing debt of Pfeiffer to the bank did not constitute such consideration as will divest Luman of his property in the fund. (3 How., 764; 36 Mo., 599; 17 Mo. App., 245; 6 Conn., 521; 30 Md., 392; 79 Pa. St., 384; 41 id., 251; 114 id., 328; 2 Pars. on Cont., 104; Burnett v. Bank, 38 Mich., 630.) The following were also cited in support of the proposition that the bank was not a bona fide purchaser for value. (29 N. Y., 598; 66 Wis., 401; 57 Ia., 573; 15 Mass., 156.)

Groesbeck, Chief Justice.

This cause was decided at the October, 1894, term of this court and the judgment of the district court of Sweetwater County was reversed. 38 Pac., 978. (5 Wyo., 159.) A rehearing was granted, and the cause was fully argued thereon. The former decision did not go to the merits of the cause, and it is first necessary to review the former opinion of this court to see whether it can be upheld.

1. It was held in the former decision of this court, that the district court erred in the admission of certain conversations between Luman, the plaintiff below, and one Pfeiffer. The facts are fully stated in the former opinion, but they will be reviewed as a matter of convenience. Pfeiffer had mortgaged certain sheep to Luman as security

9

for the payment of $24,100, evidenced by certain promissory notes, of which there was due at the time of the transactions detailed in the evidence, $19,100, under the terms of the instrument making the whole debt due at the option of the mortgagee upon failure to pay any instalment when due; and there was a note for $5,000 and interest from April 9, 1893, due at that time. Under express provisions of our statute the mortgage contained a provision permitting the mortgagor to sell and dispose of the mortgaged sheep or any portion thereof in the due course of business or to preserve and care for the same, and to replace such property sold with other property of like kind and character, which shall be subject to the operation and effect of the mortgage, with a proviso that the proceeds of such sale or sales shall be applied as and toward the payment of the debt secured by the mortgage. The mortgage was filed in the office of the county clerk of Sweetwater County, in which the bank, plaintiff in error, was doing business, on the 18th of April, 1893, one week after it was executed.

The law in force at the time of the filing of the mortgage, and yet in existence, is as follows : "It shall be lawful for the parties to any mortgage, bond, conveyance, or instrument intended to operate as a mortgage of personal property as provided by law, to insert therein permission to the mortgagor to use, handle, operate, herd, manage, and control the property mortgaged, and to market, sell, and dispose of portions thereof, as may be necessary in the course of business, or to preserve and care for the same, and replace such property, or parts sold, with other property of like kind or character, which property replaced may be purchased either with the net proceeds of the mortgaged property sold, or otherwise, all of which shall be subject to the operation and effect of such mortgage, bond, conveyance, or instrument intended to operate as a mortgage. But unless permission is expressly given otherwise in the mortgage, the mortgagor shall pay over to the mortgagee all moneys received from the sale

of any part of the mortgaged property aforesaid." Sec. 13, Ch. 7, Sess. Laws 1890–91, as amended by Ch. 87, Sess. Laws 1890–91. In relation to the effect of filing the mortgage, the statute says: "Every such mortgage, bond, instrument, or conveyance intended to operate as a chattel mortgage shall take effect and be in force from and after the time of delivering the same to the clerk for filing and not before, as to all creditors and subsequent purchasers and mortgagees in good faith for valuable consideration and without notice," etc. Sec. 10, id.

Pfeiffer, the mortgagor, disposed of 1,356 head of the 6,800 head of sheep mortgaged, at Chicago and another Illinois town for $2,880, net, and took a draft on a Chicago bank in payment. On his way home and while at Laramie, Wyo., he remitted this draft to the Rock Springs National Bank, indorsed by him to such bank, with directions to place it to his credit, and stated that he would leave for Rock Springs the day following. This letter with the remittance was received by the bank on the following day, November 28, 1893, and it was applied by Mr. Goble, the vice-president and acting cashier, to the extent of $2,066.59 in payment of the pre-existing debts of Pfeiffer to the bank on that day; viz., $987.25 in payment of an overdue note of Pfeiffer to the bank and $1,079.34 in payment of an overdraft of Pfeiffer on the bank. Upon the arrival of Pfeiffer, the following day, November 29, Goble, the vice-president of the bank, informed Pfeiffer of the application of the money, and Pfeiffer made no objection thereto. The residue of the draft, $813.41, was then applied on the account of Tim Kinney and Company, a copartnership, the leading member of which was the president of the bank. Pfeiffer states that this application to Kinney and Company was made prior to his return, but this is contradicted by Goble and by the sworn answer of Pfeiffer to the interrogatories attached to the petition, and which were admitted as evidence on behalf of the defendant. Certain conversations between Pfeiffer and Luman, his mortgagee, after the

return of the former to Rock Springs were admitted in evidence over the objection of the defendant bank. They took place in the bank while Pfeiffer was acting as cashier. In them Pfeiffer stated to Luman that he had not come out very well with the sheep, and that the bank had taken the money which he had sent on deposit, and had used it, and he had no way of getting it. Luman suggested that Pfeiffer should see the other officers of the bank, and see if they would not become security for him on his note, and if that could be done, he, Luman, would let the matter go for two years longer. It was finally agreed that the matter should rest for a week or so, in order that Pfeiffer might see these parties and endeavor to "make some turn without bringing suit." Thereafter, Luman again saw Pfeiffer at the bank, and the latter stated that he could not do anything to help out the former. Pfeiffer further stated that the application of the money by the bank was not made with his consent, and that he had sent it in good faith that Luman should have the money. I do not see that these admissions of Pfeiffer were error. They were not material to the issue, and the same matter appears in the other testimony in the case, both in the testimony of Pfeiffer and of Goble. The former had stated in his direct evidence before the time his declarations were admitted, and without objection, that the money was applied without his consent. It nowhere appears that he did directly assent to the application of the money by the bank, except as to the credit given to Kinney and Company, and this is an undisputed fact. So far as his good faith in the transmission of the draft to his credit is concerned, that is to be gathered from his acts and not from his assertions, which can not be assumed as the act of the bank. He was legally bound to deposit the money in favor of Luman, as he was but the agent or trustee of Luman in the matter, and the proceeds of the mortgaged sheep under the terms of the mortgage and by operation of the statute should have been applied to the satisfaction *pro tanto* of the mortgage debt,

and paid to Luman, the mortagee, or passed to his credit. The defendant bank could not have been prejudiced by the admission of Pfeiffer's declarations, as the same facts were brought out by other testimony in the case not objected to, or by the evidence of witnesses for the bank.

2. The second ground of reversal in the former opinion was that the trial court erred in the rejection of testimony to show that while Pfeiffer was cashier of the bank, yet, during his absence in shipping, selling, and disposing of the mortgaged sheep, he received no compensation from the bank. It was sought to have Goble, the vice-president, testify as to this fact, but he was not allowed to do so, upon objection. By consent of parties before Goble testified, the sworn answer to the interrogatories attached to the petition and propounded to Pfeiffer as cashier of the bank, were admitted in evidence on the part of the bank, and from these it appears that while Pfeiffer was absent with the sheep, from Nov. 5 to Nov. 29, 1893, he was not discharging his duties as cashier, and received no compensation during that period. So the fact sought to be elicited from Goble was already part of the evidence of the bank, and if admitted would have been merely cumulative. But it can make no difference whether or not Pfeiffer received compensation from the bank while on his mission to Chicago, as that fact could not make him its agent as to his private concerns. There was no error in the rejection of Goble's testimony on this point, as the fact already appeared in the evidence and was not disputed, and because the bank would not have been prejudiced by its omission to show that Pfeiffer was not paid by it during his absence. It is no unusual thing for officials of a private corporation to receive salary during a vacation, or even while temporarily absent attending to matters purely private and personal, and such generosity does not make the corporation responsible for the acts or conduct of the official during such period, or indeed on any other occasion while not acting within the scope of his employment.

3. It was held in the former opinion that, by the admission of the declarations of Pfeiffer, and the rejection of Goble's testimony upon the matter of non-payment of salary, the trial court indicated by such rulings that it adopted the theory, or one of the theories of the plaintiff below, that Pfeiffer being the cashier of the bank, even while absent attending to his private business, in all matters relating to the sale of the mortgaged property, and the application of its proceeds, he acted as agent of the bank and in making up its decision "treated Pfeiffer as the agent of the bank in this transaction, and held it liable for his acts and declarations, and imputed his knowledge to it as notice." Further, that as the question of notice, being the main question in the case, upon the competent evidence was a "close" one, the case ought to be closely and accurately tried. There being no special findings in the case, the theory of the trial court can only be a matter of surmise and conjecture. The citation from Elliott's App. Proc., Sec. 591, I think rests largely upon the rulings as to the pleadings in the case. The general rule is that if the trial court arrives at the correct result, no matter how incorrectly it reasoned, the errors occurring at the trial, if not prejudicial, are cured by a proper final decision. The error complained of must be wrong and prejudicial, and must probably have operated to bring about a wrong final result. This doctrine is illustrated by the cases which hold that rejecting competent evidence that could not have influenced the decision, or admitting incompetent evidence where it could not have conduced to a wrong decision, is not error. Elliott's App. Proc., Sec. 593. I do not think that the alleged errors in the trial point unerringly to the conclusion that it adopted the theory that Pfeiffer bound the bank by his knowledge because he was its cashier. It is true that counsel for the defendant in error, the plaintiff below, in this court, advance that as one of their theories, but they do not rely upon it, to the exclusion of other theories. I can not impute to the trial court such a wilful disregard of an

elementary principle that an agent to bind his principal must act within the scope of his employment, and further, that an agency could exist in this case because Pfeiffer was cashier of the bank, and hence bound the bank during his term of service by all of his acts relating to his own affairs, outside of his duties. The presumption is that the proceedings of a trial court are correct until affirmative error has been shown; and error can not be predicated upon the rulings during the trial, unless they were erroneous and prejudicial, and must have contributed to a wrong result.

At the time of the first hearing upon the cause, I reluctantly concurred in the opinion, but upon a full examination of the record, and of the law of the case, I am convinced that I was wrong in expressing my concurrence. It is my duty to change my views when I become convinced of my error, and I do so without hesitation, as many judges have done before me. It has been well said that "consistency is the hobgoblin of small minds." Nothing can be so dangerous to the administration of justice as the presence of one in a judicial position who adheres to a decision when it is manifest to him that it is erroneous. Upon the other questions involved in the case, I am of the same opinion as upon the discussion of the case upon the original hearing, and I shall now state my views upon this question, the vital one in the case.

4. One of the grounds for affirmance urged by counsel for the defendant in error is that no knowledge or notice of the trust character of the fund was necessary to charge the bank, as the draft was applied in the payment of antecedent debts, those due the bank and Kinney & Co. It has been a matter of some dispute whether or not a person taking property in consideration of a pre-existing debt is a purchaser for value, and has lost nothing by the transaction, while others maintain that the creditor divests himself of the right of action or of securing the original liability, and places himself in a worse position than he would have done by a definite forbearance of the debt,

where there is an absolute discharge and extinguishment of the antecedent debt, which constitutes a valuable consideration.    In Fetter on Equity, the former is said to be the general rule ; but in Norton on Notes and Bills, the contrary view is adopted that an antecedent or pre-existing debt is "probably" a sufficient consideration to a negotiable bill or note or the transfer thereof, and further that a bill or note transferred as collateral to an indebtedness is "probably" transferred upon a sufficient consideration. Fetter on Equity, 96 ; Bank v. Farwell, 58 Federal, 633 ; Burnett v. Bank, 38 Mich., 630; Long v. Bussell, 45 N. Y. Sup. Ct., 435.    I trust that Mr. Justice Conaway, who has devoted much time to the consideration of this question, will present his views fully in his opinion in the case, as it will be undoubtedly a settlement of this vexed question where the doctors of the law disagree.    I do not think that it becomes necessary to decide that question, as I think that the bank had a right to treat this deposit of Pfeiffer like that of any other customer, and place it to his credit, even with the knowledge that it was not his own, but held in a fiduciary capacity, but not to apply it to the payment of his indebtedness to it, and this view will be elaborated hereafter.

This brings us to our consideration, the main question in the case.    Did the officers of the bank know or did they have sufficient information to put them upon the inquiry that the draft transmitted from Pfeiffer was the proceeds of mortgaged property and was money or its representative which belonged to another?    This question is to be determined by a review of all the facts and circumstances of the case as disclosed by the evidence.    The trial court found for the plaintiff generally, and to warrant a reversal of its finding of fact, it must be clearly against the weight of evidence or not grounded upon sufficient evidence.    As to the conclusion of law based upon a finding of fact, that is different matter, and is subject, of course, to no presumption, except such as arises generally from the action of a court of general jurisdiction, acting within its legitimate

sphere. The universal rule is that an appellate tribunal will not reverse upon a mere question of fact unless it appears that the trial court decided against the weight of evidence or contrary to the evidence. A mere conflict in the evidence is not sufficient cause for reversal, but the trial court must have decided against the weight of the evidence or upon insufficient evidence. This is particularly so where the witnesses testify in open court and where the trial court can observe, as we can not, the deportment of the witnesses upon the stand and their manner of testifying, while we are to decide without these important adjuncts in estimating the value to be put upon the testimony of each witness, and in case of a conflict of evidence, the credibility of the witness. It becomes necessary to go somewhat in detail into the evidence upon this point of notice. Pfeiffer testified that he does not think the officials of the bank knew of his relations with Luman, and that he did not think that they knew of the object of his mission to sell the sheep. He admits that the money was Luman's, and the reason for his action in not objecting to the application of the money by the bank or in not directing it to be applied to the decrease of the mortgage debt, was that he did not want to antagonize the bank. Luman testifies that during Pfeiffer's absence with the sheep he went into the bank and asked Goble, the vice-president and acting cashier, how Pfeiffer was getting along with his sheep, and when he looked for him back. Goble answered that he had not heard from Pfeiffer since he shipped the sheep from Rawlins. On cross-examination this testimony was not shaken to any extent. Hamlin, the attorney for Luman, states that on the 1st of December, 1893, he, with Luman, went to the bank for the purpose of making a demand for the money, the proceeds of the draft, and that Goble said that "he had no direct knowledge of the source from which the money was derived." Goble does not remember the exact conversation. It must have had reference to the time when the draft was received, as Goble swears that he did not know until

shortly after Pfeiffer had returned, and after the application had been made, that the money belonged to Luman. Goble testifies that the draft was issued by one Chicago bank on another so that he must have been aware that the draft was made in Chicago and that under the circumstances it must have been in payment of a transaction occurring in that city. He with all others had notice of the filing of the mortgage and of its contents, and was presumed to know the law, in respect to its provisions that all moneys received from the sale of any part of the mortgaged property should be paid over to the mortgagee. He states that at the time of the application of the moneys to the bank, he did not have any knowledge that it was realized from the sale of mortgaged property or what the money "has been received from, or when, or how." When Pfeiffer left town, he "supposed, or at least understood, that he was going out with sheep," that Pfeiffer had a sheep ranch over north of Rock Springs, that he heard that Pfeiffer was east with sheep, on the street, but did not know where he got the information or "rumor;" that he knew in a general way of Pfeiffer's financial condition and standing, and that he was engaged in the sheep business; that he knew when Pfeiffer bought these sheep, and would n't have thought that he had money sufficient to pay for them; that he did know some months after the purchase of these sheep that Pfeiffer was in debt on them, but did not know how much; that he knew that the purchase from Luman "covered a good deal of money;" that Pfeiffer had about one thousand dollars' worth of property outside of his sheep business, some of it in the shape of a homestead, which he supposed was his; that he, Goble, had a conversation with Kinney, a director of the bank after Pfeiffer went away; that he stated to Kinney, in speaking of Pfeiffer's affairs in a general way, that it looked bad for him, Pfeiffer, "the way the market was going, and the way the prices were declining." In addition to this, Goble testifies that Pfeiffer had an income of $40 or $50 per month outside the bank, but he knew of no considerable

amount at any one time that would come except through the sheep business. He further states in response to a question by the court that the note for which a portion of the draft was supplied was given the first of August, 1893, and was due in 90 days, and that the overdraft had been accumulating from June to December of that year, and he refreshes his memory by asking Luman in open court about the time of the receipts for the wool, sometime in June, 1893.

The draft was forwarded to the bank from Laramie, about a day's journey by rail from Rock Springs. At the time of its application, Pfeiffer was indebted to the bank over two thousand dollars and to a copartnership, of which a leading director of the bank and its president was a member, for a thousand dollars more; and this latter fact seems to have been known to Goble at the time of the application of the moneys as he suggested the transfer, and as Pfeiffer states that the application was made by Goble, and Goble states that it was done with the sanction of Pfeiffer. It seems to me difficult to escape the conclusion, from a review of all the evidence in the case, that Goble, the vice-president of the bank, had knowledge of the source from which the draft was derived, and that it represented the proceeds of mortgaged sheep, and was merely held by Pfeiffer as trustee or agent for the true owner. In addition to the notice of the mortgage and its contents, and of the positive provisions of the statute directing the application of the proceeds of the sale of the mortgaged property to the reduction of the mortgage debt, a wise provision for the benefit of all unsecured creditors, are the facts well known to Goble that Pfeiffer was heavily in debt to Luman for the sheep; that he had gone east with sheep; that the markets were bad; that the bank held a large claim against him on balances and over-due paper; that Pfeiffer had no means from which he could realize such a comparatively large sum of money as that remitted by the draft, $2,880, except through the sale of his sheep or through the sheep business; the conversations had

with Luman, and the admission made to Hamlin that he had no "direct" knowledge of the source from which the money was derived.   These facts and others I have mentioned convince me that Goble must have known when he received the draft from Pfeiffer that it represented the proceeds of the sale of sheep mortgaged by Pfeiffer to Luman. As to what constitutes actual notice has been well stated as follows: "Vague reports from persons not interested in the property do not amount to actual notice; nor do more general assertions that some other person claims title.   It has even been stated that the notice must be given by some person interested in the property, or his agent, to the party charged, or his agent, and communicated in the same transaction, or in the negotiation leading up to it.   But it is believed that the true rule is that knowledge of facts, from whatever source obtained, which are sufficient to put an ordinarily prudent man on inquiry, will charge a purchaser with actual notice of all the facts which such an inquiry would have developed."   Fetter on Equity, 83. And again from the same author at page 96 : "The maxim that he who comes into equity must come with clean hands is peculiarly applicable to one claiming to be a bona fide purchaser.   Good faith consists in an honest intention to abstain from taking any unconscientious advantage of another, even through the forms or technicalities of law, together with an absence or belief of facts which would render the transaction unconscientious.   Not only must there be an absence of positive fraud, but any inequitable conduct by the purchaser toward his grantor, or the latter's creditors, defeats the protection which equity would otherwise accord a bona fide purchaser."   I do not think, however, that the bank is in the attitude of a purchaser of negotiable paper, as the draft should be considered as currency, and as it had the right, even with knowledge through its officer of the trust character of the fund transmitted to it by Pfeiffer, to place the amount to his credit, and even to pay his checks drawn on it, not payable to itself or passing to it with

such knowledge; but it had no right to participate in the wrongful diversion of the fund and pay itself out of the proceeds of the draft. A banker is not required to protect the rights of third parties or to initiate any inquiry between him and the customer, but if the depositor seeks to pay his own debt to the banker by an appropriation of funds to his credit, when the bank knows such funds to be of a fiduciary character, the bank then becomes liable as a participant in the unlawful diversion of the trust funds, and can not rely upon any presumption that the moneys drawn will be used in discharging the trust or for the benefit of the *cestui que* trust. 1 Morse on Banks and Banking, 317, p. 541; Howard v. Deposit Bank, 80 Ky., 496; Bank v. Clapp; 76 N. C., 482; Commercial Bank v. Jones, 18 Texas, 811. Before leaving this branch of the case, as to the notice and knowledge requisite to charge a bank with notice of the claims of third persons, we desire to cite, as supporting our views, the case of Union Stock Yards Nat. Bank v. Gillespie, 137 U. S., 411, in which the facts and circumstances developed in the evidence are somewhat analagous to those of the case at bar, and in which case the bank was held liable on testimony no stronger than that presented in this case, for applying moneys of a depositor credited in his own name, to the payment of his debts, when the bank was assumed to have had knowledge of the fact that the moneys were really those of a third person. Although the relation between a bank and its depositor is generally that of debtor and creditor, and the balance on the account is only a debt, yet the question is always open while the fund remains, To whom in equity does it beneficially belong? If the money belonged to a third person, and was held by the depositor in a fiduciary capacity, its character is not changed by being placed to the credit of the trustee in his bank account. Nat'l Bank v. Ins. Co., 102 U. S., 783. It seems to me that when this fund is traced to the bank and is converted to its own use with knowledge and notice of its trust character, that the bank should be held liable;

but otherwise when the payment is made to a third person at the direction of the trustee, as in that case the bank becomes but the mere channel or medium through which the misapplication is made.

The bank had knowledge and notice of the nature of the deposit of its trust character, and could not lawfully pay itself out of it to satisfy the indebtedness of Pfeiffer, and as to the sums so appropriated by it in payment of the amounts due it from him, on the overdraft and note, amounting to $2,066.59 and interest thereon it should be held liable. As to the residue, the sum of $813.41 passed to the credit of Tim Kinney & Co., there is not sufficient proof to show that such co-partnership participated in the diversion to hold them, and they are not parties to the suit; and the bank having merely followed the direction of Pfeiffer in this respect, was not bound to protect the rights of Luman by setting up his rights, the *jus tertii.* As to this sum, the bank is not liable.

The judgment must be affirmed as to the sum of $2,066.59 and interest thereon from the date of the wrongful application and reversed as to the remainder. The cause will be remanded to the district court for Sweetwater County, with directions that in case the plaintiff below, Abner Luman, does not file a remittitur for the sum of $813.41, with interest thereon, in such manner as to reduce the judgment to be entered as of the date of its rendition to the sum of $2,066.59, and interest thereon from the date of its application, that is, from the 28th day of November, 1893, that a new trial be granted. In case such remittitur shall be filed, the judgment shall stand affirmed as reduced.

POTTER, J., concurs.


CONAWAY, J., dissenting.

I can not concur in the view of the court in this case.

The facts are stated in the opinion of the court. Pfeiffer, in selling the mortgaged sheep and disposing of

the proceeds, was acting for himself and not for the bank. His statements in reference to these transactions, made in conversation with defendant in error and with Hamlin were erroneously admitted, over objection, as evidence against the bank. These statements, as testified to by defendant in error, were to the effect that the bank had taken the money that Pfeiffer had sent it on deposit, and had taken and used it, and he had no way of getting it. In addition to this, defendant in error is asked: "Did Pfeiffer state whether this application was made with his consent or not — this application of the money?" He answers: "He said it was not. Pfeiffer told me that he sent the money with good faith, that I should have the money." Pfeiffer testified, without objection, to the same facts. This is the proper way to prove these facts. It is not permissible to corroborate his sworn testimony by his hearsay statements introduced as admissions or declarations of the bank. They can be admissible on no other hypothesis than that they are the declarations of the bank. Hamlin also testified, over objection, to a conversation with Pfeiffer on December 1, 1893, in which Pfeiffer said in reference to the money in controversy that "he knew it belonged to Mr. Luman, but he had remitted it to the bank, and they had applied it on his debts to the bank without his consent." These statements are of a character to be very prejudicial, and their admission is prejudicial error, sufficient of itself to require a new trial. At the time these statements were made Pfeiffer had resumed the discharge of his duties as cashier of the bank. It may be that it would have been proper for defendant in error to have made a demand upon the bank for the money in controversy through Pfeiffer as cashier, at that time, and proper for Pfeiffer to have answered for the bank, as its cashier, that it declined to pay the money. But neither then nor at any other time was it permissible for Pfeiffer to speak for the bank in reference to his intention in making the deposit, or to say for the bank that it had taken and used the money, or to give charac-

ter to his own past transactions in any respect. These matters involve considerations arising from the sale of the sheep and the disposal of the proceeds in which Pfeiffer was not acting for the bank and had no authority at any time to speak for the bank, and in regard to which the bank had no control.

The error is all the more prejudicial from considerations well stated in the opinion of the court on the original hearing, in the following words:—

"The theory indicated here is that Pfeiffer should be deemed the cashier and authorized agent of the bank in the particular transaction,— the bank to be bound by his acts and declarations, and his knowledge imputed to the bank as notice,— and it must be presumed that the court tried the case on that theory. The same reasoning disposes of the claim of the defendant in error, ' there is sufficient evidence in the case of the fact that the plaintiff in error had knowledge of the rights of the defendant in error in the draft in question through its vice-president, Goble, to sustain the action of the lower court.' There is nothing in the record to indicate that the lower court so decided."

The rule applicable to such cases is well stated in Angell and Ames on Corporations, Sec. 803: "Neither the acts nor knowledge of the officer of a corporation will bind it in a matter in which he acts for himself, and deals with the corporation as if he had no official connection with it." And, I would add, there can be no question that the same rule applies to declarations. They are acts within the meaning of the rule.

Deeming the reasons for awarding a new trial, stated in the opinion of the court on the original hearing, well-grounded and sufficient, I was willing that the case should be tried anew, unprejudiced by any further expression of judicial views from this bench. But now, under the changed condition of matters, I find it necessary to examine more critically the case made by the record, and to show some additional obstacles to my concurring in the

reversal of the first decision of this court. A single good reason for granting a new trial is sufficient, whether it be the one assigned in the former opinion or not. I find in this record at least three additional reasons.

*1. The evidence in this record does not show a real subsisting debt of Pfeiffer to Luman.*

After the conversation with Pfeiffer, and some time prior to December 28, 1893, defendant in error took possession of the mortgaged herd of sheep as mortgagee. His mortgage gave him the right, on default in the payment of any instalment of the mortgage debt, to declare the whole debt due, take possession of the mortgaged property, and advertise and sell it according to law for the best prices obtainable, to pay himself the debt with accrued interest and necessary expenses, accounting to the mortgagor for any surplus. Our statute prescribes the method of advertising and selling. The sale must be at public auction in the daytime, between the hours of 10 A. M. and 4 P. M. "The mortgagee, his assignee, and his or their legal representatives, may, fairly and in good faith, purchase any of the mortgaged property offered at such sale." (Rev. Stat., Sec. 88.) Defendant in error never regularly or legally foreclosed his mortgage. On December 28 he made a settlement with Pfeiffer and took the mortgaged property and some other property in payment of the mortgage debt, except $2,880. A mortgagee may accept a release of the equity of redemption from the mortgagor, but such release is not conclusive against the mortgagor nor third parties, and the courts will scrutinize such transactions closely. The debt of Pfeiffer to defendant in error is the basis of this action. It is incumbent upon defendant in error to show that there is really such a debt fairly and honestly owing to him. What does the record reveal upon this point? It shows a note with a balance due of about $2,880. If defendant in error had stopped there in his evidence, he would have had a *prima facie* case. But other facts were too intimately associated with this to be disconnected in evidence. By

a remarkable coincidence this is the amount of Pfeiffer's deposit in the bank. Such a coincidence naturally excites inquiry and requires explanation. The explanation is furnished by defendant in error in the evidence introduced by himself. He introduces but three witnesses, Pfeiffer, himself, and his attorney. His attorney knows nothing, and testifies to nothing, about the settlement of December 28. But Pfeiffer in his testimony-in-chief says : " Mr. Luman gave me back all my paper except $2,880. He retained that in order to bring this action." He repeats this in substance on cross-examination. On re-examination, in response to leading questions, he explains further : —

" Q. You say Mr. Luman insisted upon keeping back $2,880 of this money for the purpose of suing the bank? A. Yes, sir. Q. Is n't it a fact that he insisted because it was his? A. Yes, sir. Q. And that he holds you as well as the bank for it in case he has no action against the bank? A. I suppose he does. Q. You are liable for that amount? A. I expect that is it."

So it appears by his own showing, by his own witness, that the settlement of defendant in error with Pfeiffer on December 28 was such a settlement as to leave Pfeiffer in doubt as to whether he still owed anything or not. Pfeiffer's language is well chosen so as not to be an admission of any actual indebtedness in case of a future action against him. The language is not sufficient to authorize a judgment against him. And it further appears from the testimony of defendant in error himself that he does not regard the debt from Pfeiffer to himself as a real debt. He calls it a supposed debt. In his testimony appears these questions and answers : " Q. At the time of settlement what amount was supposed to be due upon this note? A. Supposed to be $2,880. Q. Interest and all up to that date? A. Yes, sir."

And so they make out a claim which is suppositious as against Pfeiffer, but real, or supposed to be real, as against the bank. And these suppositions, and this sup-

positious debt or claim, are the basis of the judgment in this case.

Now, banking is a lawful and legitimate business. The rights and liabilities of banks are measured by the same rules of law that measure the rights and liabilities of other parties. A debt or claim which is suppositious as against another party can not be real as against a bank. It is error to consider it so. Suppositions do not sustain judgments. This court says in reference to Pfeiffer's testimony: "He admits that the money was Luman's." What he actually says upon this point appears in the following questions by the court, and his answers:

"Q. At the time you shipped this money whose money was it? A. The draft was made out to me. Q. Whose money was it? A. For the sheep covered by this mortgage. Q. Whose money was it? A. Perhaps it was Luman's."

Whether it was Luman's or not is a question of law under the facts proved, and it is a very grave and difficult question. No authority whatever has been cited to show that it was Luman's. If it was Luman's, it constitutes an exception to the general rule, well established by the authorities, that the lien of a chattel mortgage does not follow the proceeds of sales of the mortgaged chattels. And the time mentioned is the time when Pfeiffer "shipped this money." The court ignores in this connection the settlement of December 28. If the money was Luman's, it was his by virtue of his mortgage lien.

*II. It is not settled in this State or elsewhere that the lien of a mortgage follows the proceeds of sales of portions of the mortgaged property under the conditions proven in this case.*

The general rule of chattel mortgages is that in case of sale of mortgaged chattels by the mortgagor the lien of the mortgage follows the property and does not follow the proceeds. And this rule does not change as to the proceeds when the mortgaged property is sold, discharged of the mortgage lien by consent of the mortgagee (Smith v. Crawford Co. State Bank, 61 N. W.). The case of Cone

v. Ivinson, decided by this court (4 Wyo., 203), is, perhaps, as nearly analagous to the case at bar as any Wyoming case which has been reported. It came up on demurrer to the petition. Plaintiff held a mortgage upon a herd of sheep. Defendant was a junior mortgagee of the same property. The petition charged full notice and knowledge by defendant of plaintiff's rights, and that all of the mortgaged property theretofore unsold was, at a certain date, sold by the mortgagor at the request and instigation of defendant, and that defendant collected the proceeds and applied them in payment of the antecedent indebtedness of the mortgagor to him. Plaintiff based his action upon two propositions : —

"(1) That the plaintiff's mortgage was and continued to be a lien upon the property up to the time of the sale prior and paramount to the lien of the defendant. (2) Upon the sale of the property these liens attached in the same order of priority to the proceeds."

The court ignored these propositions, but held the petition good as alleging a conversion by the sale of the property of the mortgagee in the sheep, for which conversion defendant was liable as having requested and instigated the sale. There was a dissenting opinion upon the ground that the allegations of the petition did not show a sale in hostility to the mortgage lien; but the court seems to have been unanimous in the opinion that the lien of the mortgage did not follow the proceeds of the sale of the mortgaged chattels.

By the terms of the mortgage of defendant in error in the case at bar, Pfeiffer, the mortgagor, had express authority to sell portions of the mortgaged property discharged of the mortgage lien, which he did. This authority to sell was coupled with an express contract duty under the mortgage, and a statutory duty under the statute, to apply the proceeds of such sales toward the payment of the mortgage debt, which he did not. Who is responsible for this failure? No one instigated or requested this. The sale of the mortgaged property and

the deposit of the proceeds to his own credit by the mortgagor were purely voluntary acts on his part. Instead of the direction "please place to my credit," he could have said, place to credit of Luman, place to my credit as trustee, or place to my credit as agent. It was a matter in which he was not acting for the bank, and in which the bank had no control. Whether under such a mortgage as this and such a statute as ours the lien of the mortgage will be held to follow the proceeds of sales of portions of the mortgaged property, has not, I believe, been judicially determined. If such is to be the rule, it is an exception to the general law of chattel mortgages. It is an exception made by no express provision of statute. It is an exception made, or sought to be made, by judicial construction, if at all. It is an exception of very grave importance. It is an exception which should not be judicially assumed to exist, but should be established, if at all, only after thorough argument and careful deliberation. It is an exception which must be assumed to exist in order to sustain the judgment in this case. And not only must the lien be assumed to follow the funds in the hands of the mortgagor, but in the hands of third parties. This point has not been argued or considered. I will not discuss the question nor express an opinion upon it. It is a matter of much too serious import to the business interests of the State to be decided without the most careful consideration.

In order to reach the third obstacle that I find in my way in endeavoring to concur with the court, it seems necessary that I make a supposition myself. I will do so, not as a basis of a judgment, but merely for the purpose of argument. I have to confess to one single, solitary weakness in this connection. I do like an argument, conducted with decorum; and, merely for the purposes of the discussion, will make one supposition in favor of defendant in error, in addition to his own supposition that Pfeiffer owes him $2,880. I will suppose, additionally, that Pfeiffer held that amount charged with a lien or trust in favor of defendant in error. This brings me to obstacle

*III. The evidence in this record shows that plaintiff in error was a holder for value, of the fund in controversy, in due course of business, without notice of Luman's claim.*

Under this branch of the case it is necessary to consider four propositions urged on behalf of defendant in error by his counsel. The first is that the discharge of an antecedent indebtedness is not a valuable consideration for the transfer of negotiable paper, as against undisclosed equities of third parties. The money reached the bank in the form of a negotiable draft, was placed to Pfeiffer's credit according to his direction, thus discharging his debt to the bank, and leaving a balance to his credit. In the following States a holder of negotiable paper taken as collateral security for a pre-existing debt is not a holder for value under the rule cutting off undisclosed equities:

Alabama: Fenonille v. Hamilton, 35 Ala., 319; Connersly v. Bank, 66 Ala., 432; Reid v. Bank, 70 Ala., 200.

Arkansas: Bertrand v. Barkman, 13 Ark., 150.

Iowa: Ruddick v. Lloyd, 15 Iowa, 441; Davis v. Strohm, 17 Iowa, 421.

Kentucky: Alexander v. Springfield Bank, 2 Met., 543; May v. Quinby, 3 Bush., 96; Breckenridge v. Moore, 3 B. Monroe, 629.

Maine: Nutter v. Stover, 48 Me., 163; Bramhall v. Beckett, 31 Me., 205.

Minnesota: Becker v. Bank, 31 Minn., 311.

Mississippi: Brooks v. Whitson, 7 S. & M., 513.

New Hampshire: Williams v. Little, 11 N. H., 66; Jenness v. Bean, 10 N. H., 266; Fletcher v. Chase, 11 N. H., 38; Rice v. Raitt, 17 N. H., 116.

New York: Moore v. Ryder. 65 N. Y., 438; Comstock v. Hier, 73 N. Y., 269.

Ohio: Roxborough v. Messick, 6 O. S., 448; Pitts v. Foglesong, 37 O. S., 676.

Pennsylvania: Ashton's Appeal, 73 Pa. St., 153; Royer v. Bank, 83 Pa. St., 377; Pratt's Appeal, 73 Pa. St., 378; Maynard v. Bank, 78 Pa. St., 250.

Tennessee: King v. Doolittle, 1 Head, 77.

Wisconsin: Bowman v. Van Kuren, 29 Wis., 209; Body v. Jemsen, 33 Wis., 402.

The following States hold directly to the contrary:

California: Frey v. Clifford, 44 Cal., 335; Davis v. Russell, 52 Cal., 611.

Connecticut: Roberts v. Hall, 37 Conn., 205.

Georgia: Gibson v. Connor, 3 Ga., 47; Bond v. Central Bank, 2 Ga., 92; Meadow v. Bird, 22 Ga., 226.

Illinois: Worcester National Bank v. Cheeney, 87 Ill., 602; Mix v. National Bank, 91 Ill., 20.

Indiana: Stranghan v. Fairchild, 80 Ind., 20.

Louisiana: Giavonovitch v. Citizen's Bank, 26 La. Ann., 15; Louisiana State Bank v. Gaienne, 22 La. Ann., 555.

Maryland: Maithland v. Bank, 40 Md., 540.

Massachusetts: La Breton v. Pierce, 2 Allen, 8; Payne v. Furnas, 117 Mass., 290; Fisher v. Fisher, 98 Mass., 203; Stoddard v. Kimball, 6 Cush., 469.

·Mississippi: Fellows v. Harris, 12 S. & M., 462.

Missouri: In this State courts hold positively both ways. The holder of negotiable paper as collateral security for an antecedent indebtedness is a holder for value according to Grant v. Kidwell, 30 Mo., 455; Boatman's Savings Institution, 38 Mo., 49, and Paulette v. Brown, 40 Mo., 52. He is not a holder for value according to Goodman v. Simonds, 19 Mo., 106, and Brainard v. Reavis, 2 Mo. App., 490.

New Jersey: In this State the holder as collateral is a holder for value under the rule. Allaire v. Hartshorn, 1 Zab., 665; Armour v. McMichael, 36 N. J. Law, 92.

And in Rhode Island: Bank v. Carrington, 5 R. I., 515; Cobb v. Doyle, 7 R. I., 550. And in South Carolina: Bank of Charleston v. Chambers, 11 Rich. (Law), 657.

And in Texas: Greenaugh v. Wheeler, 6 Tex., 515.

And in Vermont: Atkinson v. Brooks, 26 Vt., 569.

This has always been the doctrine of the federal courts

of the United States and of the courts of England. (See R. R. Co. v. Bank, 102 U. S., 14.)

In the forcible language of Justice Clifford: "Not only every court, but every judge of every court in that country concurs in the proposition that the holder of such a negotiable security, before maturity, as collateral to a pre-existing debt, without notice of any prior equities, is a *bona fide* holder, for value, in the usual course of business, and that his title to the instrument is good, and wholly unaffected by any such prior equities between the antecedent parties." It is to be remembered in this connection, that by a stronger reason is the holder unaffected by any undisclosed equities of unknown parties, because the parties are unknown, and there is no clue to them or their equities as there is in the case of prior parties to a bill or note.

In addition to the States mentioned, where the holder of negotiable paper as collateral security to a pre-existing indebtedness is a holder for value against undisclosed equities, the following States hold that a transfer in payment of a pre-existing indebtedness is a transfer for value under the rule.

Alabama: Mayherry v. Morris, 62 Ala., 116; Reid v. Bank, of Mobile, 70 Ala., 200. Arkansas: In this State the payment must be absolute and unconditional; Bertrand v. Barkman, 13 Ark., 150. Iowa: In this State payment is sufficient. Pond v. Waterloo Agricultural Works, 50, Iowa, 596. Kentucky: In this State payment is considered as suspending the right of action on the original demand, and as a sufficient consideration under the rule. Alexander v. Springfield Bank, 2 Met., 234; May v. Quinby, 3 Bush., 96; Breckenridge v. Moore, 3 B. Monroe, 629. Minnesota: In this State payment is sufficient. Stevenson v. Hyland, 11 Minn., 201. And in Mississippi: Taylor v. Love, 26 Miss., 574; Emanuel and Barnett v. White, 54 Miss., 63. And in Pennsylvania: Bardsley v. Delp, 88 Pa. St., 420. And in North Carolina: Reddick v. Jones, 6 Ired, 107. And in Wisconsin:

Stevens v. Campbell, 13 Wis., 419. And in Maine: Bramhall v. Beckett, 31 Me., 205. And in Ohio: Roxborough v. Messick, 6 O. S., 448; Comstock v. Hier, 73 O. S., 269.

And in New York: In this State Chancellor Walworth, during the long time he was on the bench, held to the doctrine that payment of pre-existing debt was not a valuable or sufficient consideration for the transfer of negotiable paper, as against undisclosed equities of third parties. Stalker v. McDonald, 6 Hill 93; Dickerson v. Tillinghast, 4 Paige's Chancery, 215. He thus applied his powerful shoulder to the judicial car and shunted it off the track, and no judge or court in that State has seemed disposed to attempt to replace it. But, by a slow and laborious process, the courts of the State of New York have laid a new track between the old track and the line upon which Chancellor Walworth left the car, and have placed the car upon the new track. They do not hold that a transfer of negotiable paper as collateral security for a pre-existing debt is for value under the rule barring undisclosed equities, but that a transfer in payment is, whether the payment be absolute or conditional. Bank of Salina v. Babcock, 21 Wend:, 449; Bank of Sandusky v. Scoville, 24 Wend., 114; Brown v. Leavitt, 31 N. Y., 113; Stettheimer v. Myer, 33 Barb., 215; Bank of St. Albans v. Gilliland, 23 Wend., 311; Atlantic National Bank of New York v. Franklin, 55 N. Y., 238; Phœnix Ins. Co. v. Church, 81 N. Y., 225; Mayer et al v. Heidelbach, 123 N. Y., 343.

In Tennessee alone it is held that payment is not a sufficient consideration under the rule (Wormley v. Lowrie, 1 Hump., 470); but this rule does not apply to an accommodation indorsement, made generally and without restriction (Kimbro v. Lytle, 10 Yerger, 417); nor where the pre-existing debt is in the form of a note with an indorser, which note is surrendered (Hill & Co. v. Bates, 10 Yerger, 429). These cases must involve the remarkable result that if two parties sign a note as principals, its

surrender is not a valuable consideration under the rule; but if one sign as principal and the other as indorser, the surrender of the note is a valuable consideration, under the rule barring undisclosed equities.

The federal courts and the courts of England hold in accordance with our State courts, excepting Tennessee.

The reason of the rule is stated by an English court in the following language : "The title to a bill on account of a pre-existing debt, and payable at a future day, does not rest upon the implied agreement to suspend his remedies. The true reason is that given by the court of common pleas in Belshaw v. Bush (11 C. B., 191) as the foundation of the judgment in that case; namely, that a negotiable security given for such a purpose is a conditional payment of the debt, the condition being that the debt revives if the security is not realized. This is precisely the effect which the parties intended the securities to have; and the doctrine is as applicable to one species of security as another, to a check payable on demand running bill or a promissory note payable to order or bearer." This evidently means if the security is not realized by the exercise of due diligence. Negligence in presenting and in endeavoring to collect the check, bill, or note, or in giving notice of nonpayment, may have the effect of discharging the original debt absolutely, although the security be never realized. And the duties which the creditor assumes by becoming a party to the paper are held, by eminent authorities, to be, of themselves, sufficient to constitute the creditor a holder for value. Dan. Neg. Inst. Sec. 831a, and notes.

The draft indorsed by Pfeiffer to the bank was credited to him by his direction as so much money, and he was allowed the benefit of the balance due him, after such credit, in the part payment of his debt to Tim Kinney & Co. The draft was actually negotiable and commercial paper; but such paper passes, according to authorities already cited, freed from undisclosed equities of third parties, much the same as money.

The conclusions of such text writers as are at hand are in accord with these authorities.

Parsons on Bills and Notes, 7 Ed., p. 255; Byles on Bills, 5 Am. Ed., p. 229; Tiedeman on Commercial Paper, Sec. 165; Jones on Pledges, Secs. 111–114; Dan. Neg. Inst., Sec. 831a; 3 Kent's Com., 12 Ed., p. 81; Jones on Mortgages, Sec. 81.

The second proposition of the defendant in error is that notice of Luman's claim was not necessary to charge the bank.

The case of the Farmer's & Mechanic's Bank v. Farwell, 58 Fed., 633, seems to support this proposition. It is there said : " In the absence of fraud or gross negligence on the part of third parties, the bank has no higher right or better title to their moneys intrusted to its depositor than the depositor has himself. It is met here by the rule that equity will follow moneys held in a fiduciary capacity as far as they can be identified, and restore them to the beneficial owner of them. If they are deposited in the bank by a trustee, agent, factor, or bailee, even if they are mingled with his own money, they do not become his property, and the bank stands in the shoes of its depositors." As to this it is certainly true that, under such circumstances, the money does not become the property of the depositor, but it does not follow that the bank stands in the shoes of its depositors. With all due respect to the eminent court announcing this opinion, it must be said that, if it be the law, then all the discussions of notice to banks and other depositors in such cases, so freely indulged in by courts and text writers, are idle talk. Neither do the cases cited by the court sustain its position. The case of Penwell v. Deffell, 4 De Gex, McNaghten & Gordon, 372, merely holds that the debt from the bank to the depositor, so long as it remains due, may be followed and recovered by the true owner of the fund deposited by an agent or trustee as his own. The plain inference is that when the depositary owes the depositor nothing which he can recover, neither can the true owner

of the fund recover.   The case of Murray v. Pinkett, 12
Clark & F., 785, was not a case of conversion of trust
money or commercial paper by a trustee or agent to his
own use, but it was a deposit of bank shares.   The rule
established by the English courts is stated in Barnett v.
Brandao, 6 McNaghten & Gordon, 666.   It is held that
negotiable securities transferable by delivery to a *bona
fide* holder for value "are to be deemed, with respect to
such holder, and to the extent of the right acquired by
them by the transfer, as the property of the person trans-
ferring, whether the transfer be express or implied, and
the *bona fide* holder acquires a title which did not belong
to the person who gave it to him."   To the same effect is
Rumbell v. Metropolitan Bank, L. R. 22, B. Div., 197.
In Bank v. King, no banker's or depositor's or creditor's
lien or counterclaim against the depositor was involved.
Neither in Van Alen v. Bank, 52 N. Y., 1; nor in Bank
v. Ins.   Co., 104 U. S., 54.   In Jordon v. Bank, 74
N. Y., 467, the debt of the depositor to the bank was not
due.   In Falkland v. Bank, 84 N. Y., 145, the trust fund
was kept separate from the individual money of the de-
positor by depositing it in a different name.   And other
cases cited are not in point.   Another case supporting
the proposition of defendant in error is Burtnett v. First
National Bank of Corunna, 38 Mich., 630.   The same
remarks apply to this case as to the last.   In Boone on
Banking, Sec. 286, the rule is stated as follows : "And
where a trustee deposits money of a trust fund in a bank,
and causes it to be credited to his private account, without
notice that it is not his private property, or making any
special agreement in regard to it, he thereby converts the
money to his own use, and the bank may, in the absence
of any notice that it is not his private property, apply it
as such."   This notice in the case at bar might have been
given by Pfeiffer when he transmitted the draft to the
bank, either by informing the bank that the money repre-
sented by the draft was not his own, or by making it a
special deposit, or by depositing it as agent or trustee, or

otherwise indicating that the draft was not his own property. But he did nothing of the kind. He had an overdrawn account with the bank and an overdue note in the bank, and he directed the amount of the draft to be placed to his credit, which was done, leaving a balance in his favor. It was not the fault of the bank that the fund which Luman claims was in the form of an ordinary bank draft, payable to the order of Pfeiffer, indorsed by him to the bank, or that it was delivered by him to the bank. In none of these things had the bank any control, or any interest different from their interest in the business of any other customer similarly situated.

In Morse on Banks and Banking, 3d Ed. Sec., 326, the rule is stated at length in these words: "Neither shall the banker have his lien upon non-negotiable property subject to a trust, and improperly left with him or pledged to him by the trustee, though the bank is without notice of the trust; unless, indeed, the *cestui que trust* shall have done some act or been guilty of some negligence, such as to deprive him of his counter rights. And a deposit in the name of A as agent or trustee, or in the name of A if the bank has notice that it belongs to another, can not be applied by the bank to A's debt to itself, nor will it have a lien on a fiduciary deposit. If the trust property is traceable to the debt now due from the bank to the depositor, the true owner can claim the fund." And here it is to be remembered that when the amount of the draft was placed to Pfeiffer's credit, the debt due from the bank to him was the excess of his deposit over his indebtedness to the bank. And when this balance was applied upon his debt to Tim Kinney and Co., with his sanction or by his direction, there was left no debt due from the bank to him. Morse proceeds: "But if the trust property consists of bills or notes payable to bearer, or other property transferable by delivery merely, and be not earmarked as trust property, if the customer deposit them as if they were his own, and the banker receives them in due course, *bona fide* and with no notice of the trust, he shall hold

them under his lien. In the case of money or any negotiable securities, it has been frequently held that where the bank has no notice that they do not belong to the depositor, it acquires a valid lien for his indebtedness." This rule is well established, and the cases in real or apparent conflict with it are few. The following cases are cited on behalf of defendant in error on this point. Bank of the Metropolis v. The New England Bank, 1 How., 234; Wilson v. Smith, 3 How., 764; Milliken v. Shopleigh, 36 Mo., 599; Bury v. Woods, 17 Mo. App., 245; Miller v. Bank, 30 Ala., 392; Bank v. Gregg, 79 Pa. St., 384; Jones v. Milliken, 41 Pa. St., 251; Hackett v. Reynolds, 114 Pa. St., 328. These cases can hardly be considered as directly in point. They are cases of the indorsement of negotiable paper to a bank or other collecting agent for collection pursuant to a custom of taking paper for collection in that way. In so far as they are analogous to the case at bar they are against the contention of defendant in error. They establish the doctrine that a subagent taking negotiable paper for collection apparently belonging to the party from whom it is received, will be entitled to charge against the proceeds of the collection a balance against such party which has been allowed to arise in the course of the business in anticipation of such collection. In the case of a bank and its depositors where an overdraft is allowed, it is done in anticipation of future deposits. The overwhelming weight of authority is in favor of the rule as stated by Morse and Boone, supra. And there is no peculiar virtue in what is called the banker's lien. Any other creditor of an agent or trustee receiving trust funds from him, for value without notice of the trust, would have just the same protection as a banker under his lien. All that the real owner could recover would be the balance due to the agent or trustee. See Johnson v. Payne and Williams Bank, 56 Mo. App., 257; Kavanaugh v. Farmers' Bank of Maithland, 59 Mo. App., 540; Security Bank v. N. W. Fuel Co. (Minn.), 59 N. W., 987; Saloy v. Bank, 39 La. Ann., 90; and Gordon v. Kearney, 17 O., 572.

The third proposition urged on behalf of defendant in error is that the knowledge of Pfeiffer was notice to the bank. This has been sufficiently considered in another connection. The knowledge which Pfeiffer had of his individual business was not notice to the bank. The fourth and last proposition necessary to consider is the contention of defendant in error that the bank had notice of Luman's claim through Goble. The court holds that the bank is not liable for the amount applied on Pfeiffer's debt to Tim Kinney & Co. I concur with this, so I will consider only the question of notice as connected with the amount applied in discharge of his debt to the bank. There is no conflict in the authorities as to the proposition already stated that the relation between a bank and its depositors is that of debtor and creditor. When the amount of the draft was placed to Pfeiffer's credit, all that the bank owed him was the excess of the amount above his indebtedness to the bank. What is termed the application of a sufficient portion by the bank of this amount to the payment of his indebtedness to the bank did not change the rights of any of the parties in any particular. The so-called application of the proper amount probably consisted of clerical work in making the necessary entries on the books of the bank and canceling the note. This was done on Nov. 28th, the day the draft was received. Pfeiffer testifies that it was done without his consent. If this were true, and were material, he fully ratified all that was done in this regard on the morning of the next day when, as he testifies, Goble handed him his canceled note, and told him what had been done, within five minutes after he entered the bank. In the meantime no notice of Luman's claim had been received. (As to ratification, see Cook v. Tullis, 18 Wal., 332.) The earliest notice to the bank of Luman's claim is a demand for the money, which he testifies to as made by himself upon Goble on December 1st. Hamlin testifies to a demand made about December 8th or 9th. But the court bases its decision upon the ground that there is sufficient evi-

dence to justify a finding by the trial court that the bank had notice of Luman's equities, supposing him to have any, through knowledge acquired by or imputable to Goble before the receipt of the draft.    The rulings of the trial court already cited indicate clearly that it never passed upon or considered this question at all, but held Pfeiffer's knowledge chargeable to the bank as notice. And the evidence tending to show notice through Goble seems to me insufficient to support a finding that the bank had notice by that means.

I must call attention in passing to some inaccuracies in the statement of the testimony by the court upon this point.    It is said that Goble swears "that he did not know until shortly after Pfeiffer had returned, and after the application had been made, that the money belonged to Luman."    Now Goble nowhere intimates that he ever learned or knew that the money belonged to Luman. Whether the money did belong to Luman is a legal question which the court does not discuss nor directly decide. Hamlin testifies that on December 8th Goble stated that he had no direct knowledge of the source from which the money was derived.    This was after Luman's demand.

The record of a mortgage is notice of its contents to persons interfering with the mortgaged property to the prejudice of the mortgagee's rights.    But it is not notice, and not sufficient to put any one upon inquiry as to whether any property or money which the mortgagor may afterward possess is derived from a sale of the mortgaged property or any portion of it.    Street rumors, Goble's only source of knowledge that Pfeiffer had gone East with sheep, are not notice, and they require no attention.    Luman testifies that during Pfeiffer's absence he asked Goble how Pfeiffer was getting along with his sheep, and that Goble answered that he had not heard from Pfeiffer since he shipped those sheep from Rawlins.    Goble testifies that he could not have used this language because he " really did not know; had not heard from Pfeiffer at Rawlins or any other point."    And on cross-examination Luman is

not positive as to the language used. It is evident that Luman knew of the shipment of the sheep from Rawlins, and that Goble did not. The remainder of the testimony bearing upon Goble's knowledge of the source from which the money represented by the draft was derived, may be epitomized as follows: Goble knew that Pfeiffer had bought sheep to a considerable amount; would not thought he had money to buy so large a number without going in debt; knew that prices had declined; knew of a small income Pleiffer had outside of his employment at the bank, and about a thousand dollars in property, part of which was a homestead. He understood that when Pfeiffer left the bank he was going out with sheep; that he had a sheep ranch north of Rock Springs. The court lays stress upon the fact that the draft was a Chicago draft, and was mailed from Laramie, a point east of Rock Springs, and that it incidentally appears that Pfeiffer received returns from a shipment of wool sometime in June. The conclusion of the court is that Goble must have known, when he received the draft from Pfeiffer, that it represented the proceeds of the sale of sheep mortgaged by Pfeiffer; that it represented the proceeds of the sale of sheep mortgaged by Pfeiffer to Luman. In this conclusion I can not concur. Goble testifies positively that he had no such knowledge. Pfeiffer testifies that he did not tell any officer of the bank what he was going away for, and don't think they knew. But it is to be remarked that if they had known that he went away to sell mortgaged sheep, and that he actually sold them, it would not be knowledge that any money or commercial paper afterward deposited by him as his own was the proceeds of such sale. It is further to be remembered that the acceptance of the draft by the bank, and placing it to Pfeiffer's credit, discharged his indebtedness to the bank, and left a balance to his credit. This everywhere, except in Tennessee, made the bank a holder for value in the usual course of business. And the draft was ordinary commercial paper.

11

What is the character of notice required of undisclosed equities of third parties to defeat the rights of such holders?

Wade on Notice, at section 80, gives the following statement of the law:

" But respecting negotiable instruments, and their transfer, the purchaser occupies a more advantageous position than the purchaser of any other species of property. It is true that even he will be affected by notice of equities which would have defeated the security, in whole or in part, in the hands of the original payee; but so favorable is the law to the facile transfer of negotiable paper that it will not suffer its assignability to be obstructed by a merely technical notice to the purchaser that the obligor, as between himself and the obligee, has a defense to the demand. The notice of defenses to negotiable paper must, therefore, be actual and not merely constructive, and must be of a higher degree than circumstances sufficient to put a man of ordinary prudence on inquiry."

Luman's position is surely not better than that of the obligor in a negotiable instrument.

In Byles on Bills, page 226, the rule is stated thus:

" But mere negligence, however gross, not amounting to wilful and fraudulent blindness or abstinence from inquiry, will not, of itself, amount to notice, though it may be evidence of it."

Parsons puts it in these words:

" At one time this acquirement of property in negotiable paper was defeasible by proof of want of care; that is, if a holder lost his note, and a thief or finder passed it off to a *bona fide* holder, the property did not pass if the circumstances were such as to show negligence on the part of the purchaser, or a want of due inquiry. But the question of negligence seems now to be at an end, and nothing less than fraud defeats the title of the purchaser." (Parsons Merc. Law, page 123.)

Another author has it in these words:

" And the more correct opinion, as it seems to us, is

that the circumstances must be so pointed and emphatic as to amount to proof of *mala fides* in the abstinence of inquiry, or such as to be *prima facie* inconsistent with any other view than that there is something wrong in the title, and thus amount to constructive notice." 1 Dan. Neg. Inst., 747.

In Story on Bills, page 211, the learned author states the rule in these words :

"For a considerable length of time the doctrine prevailed that if the holder took the bill under suspicious circumstances, or without due caution and inquiry, although he gave value for it, yet he was not to be deemed a holder *bona fide* without notice. But this doctrine has since been overruled and abandoned, upon the ground of its inconvenience and obstruction to the free circulation and negotiation of exchange and other transferable paper. And it is now held that a party taking a bank note, *bona fide*, and for full value, is entitled to recover upon it, although it had been stolen, and he took it negligently."

The "considerable time" referred to commenced in 1824 with the introduction of the doctrine that negligence in making inquiry upon a knowledge of suspicious circumstances is equivalent to notice, in the case of Gill v. Cubit, 3 Barn. and Cress., 466, and ended in 1836 with the utter repudiation of that doctrine in Goodman v. Harvey, 4 Adol and El., 870. Neither in England nor in the United States has the repudiated doctrine obtained a footing since. This court was too favorable to plaintiff in error at the original hearing in saying that the question of notice under the evidence is a close question.

I will not multiply quotations nor attempt a review of the very numerous cases bearing upon this point. There seems to be little, if any, difference of opinion as to the rule in force at the present time. The case of Hamilton v. Marks, 63 Mo., 167, shows a complete change of front by the Supreme Court of Missouri on this question. In Seybel v. The National Currency Bank, 54 N. Y., 288, the prevailing doctrine is carried to a great length. The

action was for the recovery of the value of two U. S. bonds, not yet due, for one thousand dollars each. They had been stolen with a number of other bonds on the evening of September 12, 1865. They were bought by defendant next day. Before nine o'clock in the morning of that day two printed notices of the robbery, containing the numbers of the bonds, were left at the place of business of the bank, while some persons were sweeping out the room. One of these notices was placed on a desk marked "Cashier's Desk," and the other notice on a desk opposite, in such position as to be seen by the occupants of the desks when they should take their places. The cashier testified that he did not see the notice, and that it was not the custom of the bank to regard such notices, or to keep a memorandum of them. *Held*, two commissioners of appeals out of five dissenting, that the bank was not liable.

I can not agree with the court in its view of the case of The Union Stock Yards National Bank v. Gillespie, 137 U. S., 411, and 41 Fed., 231, that the evidence is no stronger against the bank in that case than the evidence in this case. The Gillespies were citizens of Kansas City, Mo., doing business there. Rappal, Sons & Co. were in the commission business at the Union Stock Yards, Chicago. They were not buyers and sellers, but agents, or factors, and known to be such by the bank. They were customers of the bank, and, at the time of the transactions out of which the suit arose, their account was largely overdrawn. This overdrawing commenced in January, 1885, with an overdraft of $1,476.25, and increased so that in June the amount of their overdrafts was $9,850.96. Notwithstanding this, on July 20 the bank, by its cashier, advised the Kansas City Stock Yards Bank as follows: "Rappal, Sons & Co. are a firm in good standing financially and otherwise. I don't think they keep much ready money in the business, but F. J. Rappal owns large farms near Joliet, and is estimated worth from $50,000 to $60,000. He is a man of

high character, and has always had good credit, even before he had any means." This letter of advice was shown to the Gillespies, who were customers of the Kansas City bank. The Rappals continued to increase their overdrafts. On October 1st their account was $18,922.21 overdrawn; on October 2d, $18,454.89. The Kansas City bank also had an arrangement with the Chicago bank for notification by telegraph in case any draft was not paid. The Gillespies were informed of this. The Gillespies made three several shipments of cattle from Kansas City to Chicago, to Rappal, Sons & Co., as factors, to sell. They drew drafts upon Rappal, Sons & Co. against these shipments. The Kansas City Stock Yards Bank discounted the drafts, and sent them to The Union Stock Yards National Bank for collection. The first shipment reached Chicago, and the cattle were sold on Friday, October 2. The draft for the amount of this shipment reached the Chicago bank the same day, was presented for payment, payment refused, and the draft protested. No notification of the dishonor of this draft was sent to the Kansas City Bank until Monday, October 5. In the meantime the two other shipments reached the Rappals, and were sold by them, the larger portion on Saturday, October 3, and the balance on Monday, October 5. They deposited their sale tickets, showing weight and price, with the Union Stock Yards Bank for collection. This bank made the collections, amounting to $26,585.90, and applied it upon the indebtedness of the Rappals to the bank.

This case has five points of strength against the Chicago bank not approached, in my opinion, by anything in the case at bar.

First. The Chicago bank had given the Rappals credit with the Gillespies by letter of recommendation. Second. The Chicago bank failed to telegraph notice of the dishonor of the first draft when it was dishonored, as it had agreed to do; if it had done so it would have enabled the Gillespies to avoid the loss of the two subsequent consignments, for the value of which the suit was brought.

Third. The Chicago bank was acting in a fiduciary capacity for the Gillespies in collecting their drafts, thus incurring the duty of diligence and inquiry. Fourth. The drafts against the Rappals for these large amounts received at about the same time could hardly be understood otherwise than that the drafts drawn by the Gillespies were on account of the same property represented by the sale tickets. Fifth. The sale tickets from the stock-yards were notice to the bank that the Rappals had made a sale of cattle for some customer, and that the tickets were received by them in their business as factors. If the bank had any doubt upon this point it owed the duty of diligent inquiry into the matter to the Gillespies, whose draft it held for collection.

As might be expected, the cases which go farthest in upholding the rights of holders for value of negotiable paper against undisclosed equities, are cases of equities claimed by unknown third parties who are not parties to the paper. Such is the case of Seybel v. Bank, supra. The case of Reid v. Mobile Bank, 70 Ala., 199, is such a case. Negotiable railroad bonds were deposited by one Butt, who held them as trustee for other parties, as collateral security for a debt of his own to the bank. At the time Walsh, the president, and Crawford, a director of the bank, had full knowledge that they were held in trust by Butt, and had full knowledge of the equities of the plaintiffs. Afterward the bank took the bonds in payment. It was held that the title of the bank was good against these equities because these officers did not acquire their knowledge while acting in their official capacities, or while transacting business for the bank. Neither did Goble acquire his knowledge of Pfeiffer's business while acting in his official capacity for the bank.

I think the order of this court made on the original hearing of this case, directing a new trial, should stand, for three reasons: First, for error in admitting evidence of Pfeiffer's unsworn statements as admissions of the bank to corroborate his testimony; second, because the evi-

dence does not show a real subsisting debt owing from Pfeiffer to Luman; third, because the money for which this action is brought reached the bank in the form of commercial paper, of which the bank became a *bona fide* holder for value in the usual course of business.

---

### ON MOTION FOR REHEARING.

POTTER, JUSTICE.

Upon the original hearing of this case, the judgment of the district court was reversed. A rehearing was granted, upon which the former order of reversal was vacated, and the judgment was affirmed, in part. The plaintiff in error now moves for a second rehearing.

It is urged that the district court tried the case upon an entirely different theory than that upon which we affirm the judgment. This claim was made and insisted upon at the previous hearings; we hold that whether or not, as a matter of fact the trial court imputed to the bank the knowledge of its cashier, who in his dealings with the bank was engaged in transacting his own business, that fact is not disclosed by the record; and that there is sufficient evidence to show knowledge on the part of the bank independently of that. There are no special findings of fact, or conclusions of law in the record. The case was not tried to a jury, and therefore there are no instructions to guide us to a correct knowledge of any particular theory which may have determined the case in the mind of the trial court, if that is at all material. Upon the evidence and the case as presented thereby it appears that the court found generally for the defendant in error, and rendered judgment in his favor. We are of the opinion that the evidence supports the judgment in so far as it has been affirmed, and it is not ground in such case for reversal that it is asserted, however truthfully outside of the record, that the trial court trying the case without the intervention of a jury, was largely influenced or entirely

so by some matters which are not material or do not in themselves determine the relative rights and liabilities of the parties.

It is contended that the admission of the statements of the cashier made at the bank, after he had resumed his duties there, indicates that the trial court tried and decided the case upon the theory that the knowledge of such cashier concerning the mortgage to Luman, and that the moneys in controversy were the proceeds of the mortgaged sheep, was binding upon the bank, and constituted like knowledge on its part.    In the first place, it may be said, that even had the court entertained such a view at the time of the admission of the testimony, it can hardly be assumed by the appellate court, under the disclosures of the record already pointed out, that such a theory or opinion prevailed until, and influenced entirely, or largely, the finding and judgment.    But beyond that, we are unable to attach to those statements of the cashier the importance, merit, or effect with which counsel regards them.    Such statements did not reach the point of notice to the bank of the facts or any of them which was required to render it liable.    Nothing in the declarations so received, established or indicated any notice to or knowledge of the bank; neither could any notice to or knowledge of the cashier regarding those essential facts be predicated upon anything brought out by the said statements.    Knowledge of the cashier was self-evident, and required no proof beyond the facts that he owned the sheep, sold them, received the purchase price, and was the mortgagor of the sheep in the mortgage held by Luman.    The declarations, the admission of which was complained of, went only to show that the money was sent to the bank, the disposition which was afterward made of it, and that such application was without the consent of such cashier, who had deposited the proceeds with the bank.    The fact of the receipt of the money and its disposition as stated was testified to by another bank officer, and the cashier also testified concerning his consent with respect to the after

transactions of the bank. The admission of the statements was therefore not prejudicial; they did not tend to establish any kind of notice, and such admission was harmless error, if error at all. Had such declarations gone to the extent of proving notice on the part of the cashier, a very different question would have been presented.

We can not regard the case of Smith v. Crawford County State Bank, 61 N. W., 378, as controlling of the points involved in the case at bar. It is quite evident that an entirely different statute and mortgage were under consideration in that case. We do not hold, however, that even under our statutory provisions and the mortgage in question, the lien of the mortgage attached to the proceeds; if we did, there would not arise any question of notice in the case. What we do hold is that the provisions of our statute which authorize the insertion in a chattel mortgage of permission to the mortgagor to retain possession, and sell portions of the mortgaged property, and apply the proceeds to the debt secured by the mortgage, and the existence of such a permission in the mortgage itself, imports constructive notice, the mortgage being properly filed, of the fact not only that the property therein described is covered by the mortgage, but of the provision for the sale by the mortgagor and the application of the proceeds, as well, and that such proceeds in the hands of the mortgagor are held in trust, and any one who obtains them with notice or knowledge that they are the proceeds of certain property, which property was in fact covered by the mortgage, is liable to respond to the mortgagee therefor. Having constructive notice of the fact of the mortgage and its provisions, and actual notice or knowledge of the source from which the money was derived, the liability follows. Rehearing must be denied.

Groesbeck, C. J. concurs.

Conaway, J., dissenting.

It seems necessary to a proper presentation of some of the points in which I can not concur with the majority of the court, that I now say a few words. In considering the petition for a second rehearing the court says: "We do not hold, however, that even under our statutory provisions and the mortgage in question the lien of the mortgage attached to the proceeds; if we did, there would not arise any question of notice in the case."

I have always regarded and still regard as elementary law, that a chattel mortgage does not affect, either as a lien or otherwise, third parties without notice. I am not particular whether we say that the fund in the hands of the mortgagor arising from the sale of part of the mortgaged property was charged with a lien, or charged with a trust. In either case it would be by virtue of the mortgage, and would not affect third parties without notice to them of the lien or trust. The record was notice of the mortgage and its contents. It was not notice that any of the mortgaged property was afterward sold, or that the fund in controversy was the proceeds of such sale, or charged in any manner with a lien or trust. It further seems clear to me from the evidence that plaintiff in error had no notice of the claim of defendant in error to the fund, whether arising from a lien, or from a trust, or otherwise, until the demand was made for the money after the consummation of all the transactions out of which this suit has arisen. The only attempt to bring such notice home to the bank, outside of the knowledge of Pfeiffer, the mortgagor, of his own personal business transactions, is through the knowledge of Goble, vice-president, and acting cashier in Pfeiffer's absence, of Pfeiffer's business and of his financial condition. And he testifies positively that he had no knowledge at the time of the receipt of the draft by the bank of the source from which the money represented by the draft was derived. After Luman's demand for the money he stated that he had no direct knowledge of the source from which it was derived.

In regard to the admission of evidence of Pfeiffer's dec-

larations, as against the bank, in addition to what is stated in the opinion of the court, it is to be remarked witnesses were permitted to testify that he said that he knew the money was Luman's; that he sent it in good faith, intending that Luman should have it; and that the bank had taken it and used it, and he had no way of getting it. All this would be excluded on objection unless it were regarded as admissions of the bank. So regarded, it must be, in my opinion, very prejudicial. And if the language of Pfeiffer in regard to his business transactions was regarded as admissions of the bank, then his acts must have been regarded as the acts of the bank, and his knowledge as the knowledge of the bank. And in my opinion the record is not consistent with the trial of the case on any other theory. I believe the other points of difference of opinion with the court are sufficiently clear in the former opinion. I am of the opinion that a new trial should be awarded.